Ida B. Tennes and First National Bank of Chicago, Executor of Estate of Mont J. Tennes, Deceased, Appellants, v. Joe Tennes, Appellee.

Gen. No. 42,277.

Opinion filed June 30, 1943.

W. F. McLaughlin, of Chicago, for appellants.

Arthur J. Donovan, of Chicago, for appellee; John J. Sullivan and Charles E. Heckler, both of Chicago, of counsel.

On Rehearing.

Mr. Presiding Justice Burke delivered the opinion of the court.

On March 21, 1940 Ida B. Tennes and Mont J. Tennes filed their two count amended complaint in the superior court of Cook county against Joe Tennes. On April 2, 1941 they filed an amendment consisting of two additional counts. The first count alleges (1) that on June 13, 1938 the defendant, Joe Tennes, was managing and operating a motor vehicle on and along route 45 in the State of Wisconsin, about eight miles south of Marion, traveling at a speed of approximately 45 miles per hour; (2) that Ida B. Tennes was riding in the automobile of defendant as an invited guest; that she had nothing to do with the driving of the vehicle and had no control or direction over the operation of the vehicle or its driver; (3) that she was then and there exercising due care and caution for her own safety; (4) that the defendant then and there being tired, exhausted and sleepy, knew and was conscious of the fact that he was about to fall asleep; that if he did fall asleep while operating his automobile it would probably result in injuries to others, and particularly to the plaintiff; that with an entire absence of care for the life, person or property of others, and with a conscious indifference to the surrounding circumstances and conditions and with wilful disregard of the consequences, he wilfully and wantonly drove his automobile at a speed of about 45 miles an hour; that while so operating his automobile, the defendant fell asleep, thereby losing control of his automobile, resulting in its running off the road, turning over several times and injuring her; (5) that in consequence of the negligence aforesaid, and as a direct and proximate result thereof, she, Ida B. Tennes, was greatly injured. She asked judgment in the sum of $25,000. The second count was filed in behalf of Mont. J. Tennes and repeated the allegations of the first count. It then added that on June 13, 1938 Mont. J. Tennes was the husband of Ida B. Tennes and continued to be her husband; that

he was obligated to furnish her support and necessaries, and that because of the negligence of the defendant he was compelled to lay out and expend $8,500 in endeavoring to have her cured. He asked judgment in the sum of $10,000. The third count in behalf of both plaintiffs repeats the allegations of paragraphs 1, 2 and 3 of the first count, and also alleges that under the law of the State of Wisconsin it became and was the duty of the defendant to operate, control and manage the motor vehicle with ordinary and reasonable care to prevent injury to the plaintiff, Ida B. Tennes, but that the defendant so negligently drove and operated his automobile that as a proximate result of said negligence and improper operation, the automobile went off the road and overturned; that prior to and at the time aforesaid defendant was operating his automobile without conscious possession of his faculties and was then and there asleep. In this count plaintiff repeated the allegations as to the injuries suffered. In the fourth count plaintiffs repeated and realleged paragraphs 1, 2, 3, 4, 5 and 6 of count 2, and also repeated the allegation last above quoted from count 3. Defendant answered, admitting that he was operating a certain motor vehicle on route 45 in the State of Wisconsin and denying all other allegations. He further alleged that the plaintiff, Ida B. Tennes, was guilty of wilful and wanton conduct "which contributed to the cause of this accident." Before the trial, Mont J. Tennes died, and the First National Bank of Chicago, executor of his estate, was substituted as a party plaintiff. A trial before the court and a jury resulted in a verdict finding the defendant not guilty. At the close of all the evidence plaintiff moved the court to instruct the jury to return a verdict finding the defendant guilty, leaving only the question of the damages to the jury. This motion was overruled. Motions by the plaintiff for a judgment notwithstanding

the verdict and in the alternative for a new trial, were likewise overruled, and judgment was entered on the verdict. This appeal followed.

Joe Tennes, the defendant, called by plaintiff under section 60 of the Civil Practice Act [Jones Ill. Stats. Ann. 104.060], testified that he was a nephew of Mont J. Tennes, deceased; that on June 13, 1938, he invited his aunt by marriage, Ida B. Tennes, to ride with him from Chicago to Eagle River, Wisconsin, where his aunt and uncle had a summer home. He had been driving an automobile since 1935. They left Chicago about 9 o'clock in the morning and had lunch at a hotel in Fond du Lac, Wisconsin. After lunch they continued to drive on route 45. He testified that he was driving at a speed of between 35 and 45 miles an hour; that he did not drive over 45 miles an hour at any time; that Mrs. Tennes was sitting next to him in the automobile; that they were not engaged in conversation; that "when we got some place around Marion, Wisconsin,—I don't know just how far it was—I had been feeling rather tired and drowsy, but not to a point I hadn't been that way before while driving an automobile, and the only thing I vividly remember at that point is I evidently dozed for a minute. The next thing I remember I heard Mrs. Tennes say, 'Joe, Joe,' and with that it was just like being on a very rough road. Then, of course, the next thing I was knocked unconscious and woke up later on the side of the road. I didn't have any sensation of hitting anything. I think we ran off the right hand side of the road, the car was on the right hand side when I came to. Mrs. Tennes was lying on the side of the road." He further testified that they waited until an ambulance came, which took them to a hospital at Clintonville, where they were treated by a physician and remained overnight. He stated that he was knocked unconscious at the time of the accident. He was then examined by his own attorney and testified that "I

was going to Eagle River for a visit and a week's vacation. I was going up as a guest of my aunt and uncle. Usually she would drive up there with one of her sons or go by train. I don't believe she drives herself, she usually drove up with some member of .the family. They had cars and someone to drive them. On this occasion I asked her to drive with me. I was going up. I don't believe I ever drove her up there. I suppose there were times when I drove her around Eagle River, but not very much.'' The attorney for plaintiff then objected to the attorney for the defendant continuing the examination of the defendant without making the defendant his own witness. At this juncture the attorney .for plaintiff stated that he understood the attorney for the defendant was calling the defendant as his (defendant's) witness, and that he had no objection. The attorney for defendant answered: ''Oh, no,'' and continued to examine his own client. In this examination by defendant's attorney, the defendant further testified:

''My relations with my aunt and uncle were very friendly. My aunt did not indicate the rate of speed at which she wanted to go. We were in no hurry. I had a small motor car. We had no reason to drive fast, so we stayed at 35 to 45 miles an hour. We might sometimes have hit 50. At the time of the accident, I was doing from 35 to 45. I was perfectly sober. I was perfectly alert as I was driving along the road. I do not recall having passed a vehicle just before the accident. I had passed a number of vehicles during the day.

On further examination by his own attorney, defendant testified as follows:

''Q. Well were you just turning in from passing a truck? Had you just turned in from passing a truck at the time you lost control of this car?

''A. Well, as I said, I have no sensation of losing control. The only thing I remember is when I was

called to and at that time I was like on a rough road. I have no recollection of losing control, of seeing myself go off the road. I had slept well the night before. I got up at 7 o'clock that morning, it was a bright warm day.

"Q. Do you remember you stopped in back of a truck at a point where the road was definitely obstructed by a barricade on the road there?" An objection to this question on the ground that it was leading was overruled.

"Q. Now the question I would like to ask you is whether you recall going back along the road. when the road was being repaired and do you recall you just had to crawl along there for some considerable distance, maybe 1000 feet or so, before you reached the point where you had the accident?

"A. No, I can't say I do. I don't remember any particular obstruction in the road. It was clear as I recall. I haven't any clear recollection of any one truck. I don't remember anything after my aunt called to me: 'Joe, Joe.' As I said it was just like I was on a very rough road. I don't know where I was. I don't know whether I was on the pavement or off when she said, 'Joe, Joe.' Up to that time I was driving straight along the pavement as far as I know. I haven't any idea how long I was unconscious."

On re-examination by attorney for plaintiff, the defendant was asked: "And you went to sleep at the wheel at that point?" The attorney for defendant interposed an objection to the question, which the court sustained. Forest M. Cline, an X-ray technician, identified X-ray pictures of Ida B. Tennes. He also produced X-ray films, receipted bills and canceled checks showing payment by Mr. Tennes. Dorothy Tennes, a daughter of Ida B. and Mont J. Tennes, testified that she saw her mother at Mercy Hospital, Chicago, the day after the accident; that her mother was in bed, bruised, her face discolored and

swollen, and her leg in a cast; that her mother remained in the hospital until the second week in August; that trained nurses were in attendance 24 hours a day; that her mother was brought home from the hospital about August 11th and remained in bed at home until the end of August; that at home two trained nurses were in attendance for 12 hours a day; that witness' brother then took their mother to Eagle River in an automobile from which a seat had been removed and in which a cot had been installed; that the mother remained in Eagle River until about October 30th; that she was driven home in the same car, and shortly thereafter returned to Mercy Hospital, where she remained for about a week; that the knee was held together by a screw; that during this stay in the hospital she had trained nurses on eight hour duty; and that the patient then returned home, where she was attended by a trained nurse until the early part of December. This witness then produced her father's canceled checks issued for payment of medical services.

Dr. Michael F. McGuire, the attending physician testified that he had known Ida B. Tennes for about 15 years. On or about June 13, 1938 he was told that Mrs. Tennes had an automobile accident in Wisconsin. He drove over there that evening and saw her in a hospital. He obtained a history of the accident and saw an X-ray of her leg. She was in bed in considerable shock. She had received first aid treatment and was in pain. Her knee was swollen, her pulse fast and her blood pressure considerably fallen. She was pale and under the influence of opiates. She had received some shock treatment. She had a fracture of her left collar bone, and after she was brought back to Chicago, X-rays disclosed a fracture of two ribs. She had a deep laceration of her right leg, and suffered hemorrhages all through her body. She was black and blue from her knees to above

her thighs, particularly above the left leg. The right leg was also bruised. She was taken to Mercy Hospital, where she was X-rayed and consultations were held. This witness identified the X-rays, described the fracture of the knee and detailed the treatment and operation performed by Dr. John Claridge at which the witness assisted. Mrs. Tennes was at Mercy Hospital twice. Dr. McGuire testified further that under the circumstances of the family, a charge of $10,000 would not have been unreasonable. He identified a check for $1,250 which he received for his services, and a check for the same amount which was received by Dr. Claridge, also a check for $250 received by Dr. Chandler. He further testified about the payment of nurses' bills and two bills from the hospital totaling $771.20. He had known and treated Mrs. Tennes before the accident. She had high blood pressure before the accident. He was asked as to whether it would be safe for Mrs. Tennes to come to court to testify. An objection to this question was sustained. Dr. Claridge and Emmy Carlson, and a masseuse, also testified.

Defendant's motion for a directed verdict was denied. Thereupon, defendant put in evidence the deposition of plaintiff, Ida B. Tennes, taken by defendant's attorney previous to the trial. She deposed that she was the aunt of defendant; that she was and continued to be friendly with him; that he still visited her at her home; that she was in his car (in which she had before ridden) when she got hurt; that he invited her to drive with him to Eagle River and she accepted; that she had no reason to be concerned about his driving; that she had ridden with him before, and that after lunch they resumed their way to Eagle River. She continues:

"We were going between 40 and 45 miles an hour which satisfied me. Just before the accident we came by a truck on the road and went right in front of it. We were going about 40 miles an hour when we came

to the truck and went around it. We were on the right hand side of the pavement and Joe swung to the left and then he came back in front. We had gotten quite a way ahead of the truck before he ran off the road. I couldn't remember how far it was, there are no blocks up there, just a plain field. I know we did pass a truck and that shortly after the accident occurred. I felt a vibration on the right side, and that is all I remember. We weren't off the road when the accident happened. I think we hit something. I could feel the vibration of the wheel on the right side of the car. When I felt the vibration I said, Oh, Joe, and that is all I remember. I think we hit a stone. I don't know. I haven't the slightest idea whether the car tipped over. I was out I guess. When I came to, I was lying on the grass, and the truck man was standing over me. He told me the car turned over three times. I couldn't tell you whether there was a ditch along the road. We didn't hit another car. The road was clear, except for the truck that was in back of us. I was taken to a hospital at, I think it was Clintonville.''

The witness then related her return to and stay at Mercy Hospital, her treatments by Doctors McGuire and Claridge, and of trips she had since taken. She then said:

''This foot is stiff. I will never be able to straighten this out. My knee is stiff, I cannot kneel down. I cannot get in the bath tub. I have to sit down. This is as much as I can bend it. When I stand up, I can straighten it, but I cannot bend it. My collar bone was broken and I could not raise my hand. I am walking around now. I had three ribs broken and my jaw fractured and the inside of my mouth all cut. I thought at the time I had a broken nose, but the swelling went down. My present difficulty is the stiffening of my knee. That is about as much [movement] as I can get.

"Q. About a right angle, just so you can sit down?

"A. You can see where the bone was put together; I had a screw in that. I certainly had a tough time of it. All the bills were paid by my husband. My nephew didn't pay any of them. My nephew came to see me after I was hurt. For about six weeks I could not see anybody. He still visits, there never was any bad feeling between us. The accident happened June 13, 1938. In 1938 my nephew visited me at the hospital. No one was at Eagle River in the summer of 1938. My nephew was at Eagle River as a guest for about 10 days in 1939. He went up every summer; he was there in 1940. This summer he was up there while my husband was there. I didn't pay any attention to the hospital or doctor bills. My husband took care of everything. My husband is Mont J. Tennes."

Two additional witnesses were called by the defendant. Albert Wiesman testified as follows:

"I live in Antigo, Wisconsin. I am manager of the Motor Express, a freight transportation company. I am 41 years of age. On June 13, 1938 I was transporting my furniture from Marion, Wisconsin to Antigo, Wisconsin, in a Ford V-8 truck. My son about 11 years of age was with me. I saw the accident of Ida B. Tennes. The county was oiling the road, Shawano County. Only the left side of the road was open, the southbound side. I had to wait about 10 or 15 minutes before I could turn over onto the southbound side of the road and proceed. The car of the defendant, Joe Tennes, came up behind me. After the traffic had cleared southbound, we proceeded northward. I traveled north at between 20 and 25 miles an hour. This highway has a long curve that turns to the left and is an oiled road. It was a regular road, the oil had dried up leaving the residue on top. The road is oiled wide enough so that two cars can travel. I noticed the car (of Joe Tennes) was in back of us. The car passed my truck and it swung over to the right and

hit some loose gravel and it seemed to get out of control of the driver. He hit the farmer's driveway and she tipped over there, she tipped twice, and the lady flew out, and then she (the car) struck a big rock and landed on top. The rock was about 4 feet in diameter and marks a driveway into a farm. I would say the (Tennes) car was going between 30 and 35 miles an hour when it passed me and came back in front. The road there is oiled just wide enough for two cars, on the edges is loose gravel, so that they can grade that back into the road when necessary. It seeps back into the road. When he (Tennes) struck the gravel on the road, his car turned around to the right. His car got off the road. He was trying to put her back on the road. The culvert was just a short distance from where the car slid off. When it hit the culvert, the car turned over. I pulled my truck over to the left so I wouldn't hit him, and I got out and helped them, and took the gentleman out of the car. The lady was out of the car, lying on the bank. The man was in the car, unconscious. I pulled him out and laid him on the grass. By that time another car pulled up and I had him turn around and go call an ambulance from Marion. They were taken to the Clintonville Hospital. The accident happened about 3 o'clock in the afternoon. I don't know anybody connected with the transaction. When you hit gravel you lose control of your car, if you are not very careful." Cross-Examination. "I have been in the transportation business about 15 years. We operated 2 trucks between Clintonville and Antigo, that was one truck I was operating at the time. Then we had another truck operating between Antigo and Green Bay. I talked recently to Mr. Bloomingston about being a witness here. He is the only person I talked to, except a representative of the Insurance Company. I didn't have to slow up to prevent hitting him. I would say he was between 25 and 30 feet ahead of me when he made his right angle turn. I turned to my left."

"Q. Describe the turn he made at the time he struck the gravel.

"A. He made a partial right turn. At that time he made the turn, he hit the gravel. The accident occurred 100 or 200 feet ahead of me. It was in plain view."

Leo Wiesman testified as follows:

"I live in Antigo, Wisconsin and am 14 years old. I was with my father when this accident occurred. We stopped before the accident, they were oiling the road. Another car pulled up behind us when we stopped. The southbound cars kept on going, we had to wait until they got by. After all these (southbound) cars passed, we went on. A car passed us, and it seemed like it hit some loose gravel on the side of the road and he tried to pull it back on the road, but it was too late because he hit a culvert and the car flew around in the air, it kind of bumped around to the right. It bumped into a culvert. He hit the shoulder before he hit the culvert. Then the car flew up in the air and turned around 3 times. We turned over to the left of the road and went over to the car, took the man out and laid him on the grass, and he came to, and we took care of him the best we could. It was a nice day." Cross-Examination. "I talked this matter over with Mr. Bloomingston and my father."

At the close of all the evidence, both plaintiff and defendant moved for a directed verdict and the motions were denied.

The contention of plaintiffs is that inasmuch as the defendant testified to a state of facts, which, if true, destroyed his grounds of defense, and because there was no evidence that the plaintiff Ida B. Tennes was guilty of contributory negligence, the court should have ordered a verdict of guilty as to the defendant, leaving to the jury only the question of damages to be awarded each plaintiff. Defendant asserts, and we

agree, that the verdict of a jury should not be set aside unless it is not supported by the evidence or is contrary to the manifest weight of the evidence, and that on appeal the appellee is entitled to all the favorable inferences legitimately arising from the evidence. Attorney for defendant points out that the defendant slept well the night before the accident, he got up at 7 o'clock in the morning; started on the trip at 9 o'clock; had an ordinary lunch at noon and met with this accident at 3 o'clock in the afternoon; that he drove his automobile around a truck a few seconds before the accident; that there were no circumstances which would support a probability that defendant would fall asleep at the wheel of his automobile in the middle of the afternoon; that from the testimony of plaintiff and two disinterested witnesses, the jurors were warranted in believing that the accident was proximately caused by the automobile hitting a stone or running into loose gravel and not by any alleged dozing on the part of defendant. Defendant's attorney also challenges the statement that defendant testified that he fell asleep, contending that the evidence shows defendant expressed a supposition or surmise that he evidently dozed for a minute, and defendant insists that recovery cannot rest upon speculation, conjecture or surmise. Plaintiffs concede that a jury's verdict will not be set aside unless it appears from the record that the findings are not supported by the evidence, or that they are contrary to the manifest weight of the evidence, but insist that these principles have little application to the case at bar, where the verdict is supported, if at all, by incompetent evidence. The position of defendant's counsel is that the defendant did not testify that he dozed for a minute, that the defendant merely expressed a supposition that he did so. Defendant testified that the only thing he remembered vividly was that "at that point I evidently dozed for a minute. The next thing I remember was Mrs. Tennes saying,

'Joe, Joe,' and that it .was just like being on a very rough road. Then, of course, the next thing I was knocked unconscious and woke up later on the side of the road. I didn't have any sensation of hitting anything." The adverb "evidently" is defined in Webster's New International Dictionary, second edition, as follows: "In an evident manner, perceptibly, clearly, obviously, plainly." Corpus Juris Secundum, vol. 32, page 1140, defines "evidently" as "in an evident manner, clearly, obviously, plainly," and states that "the term is employed to express the idea of full proof-conviction." Defendant states that the dozing was the only thing he remembered vividly. We find that the defendant testified that he went to sleep just prior to the accident. It is apparent that the attorneys for both parties considered defendant's testimony as a positive statement that he went to sleep, because the court sustained an objection by defendant's counsel to the following question put by plaintiffs' attorney to the defendant, "And you went to sleep at the wheel at this point?" This was a proper question unless the court and counsel considered that the proof of defendant having gone to sleep while driving was so strong as to make further proof on the subject of surplusage. A perusal of the portion of the transcript showing the argument made to the jury by defendant's counsel shows that he recognized that his client had testified that he (defendant) went to sleep at the wheel.

The attorney for defendant made the following statement in his argument:

"He is not her attorney, he is my client's attorney too. . . . My client comes on the witness stand here and tells you a story which is grotesque. . . . All right, what does this mean? It was entirely different than three other people tell the story. . . . By the same token, you don't have to tell twelve intelligent people, such as I am looking at, just what

the low down in this case is. . . . I didn't even put him on. I didn't even put my client on. He put on my client. Well, if you swallow that it is all right with me, ladies and gentlemen.''

We agree with plaintiffs that the clear and natural inference of this argument was that the defendant had been committing perjury, and that he had entered into a conspiracy with the plaintiffs. Obviously defendant's attorney was complaining to the jury of the testimony about his client having gone to sleep. The parties are in agreement that it is only where a party testifies clearly and unequivocally to a fact which is peculiarly within his own knowledge that such testimony may be considered as a judicial admission. (*Harlow v. Leclair,* 82 N. H. 506, 136 Atl. 128; *King v. Spencer,* 115 Conn. 201, 161 Atl. 103; *Kanopka v. Kanopka,* 113 Conn. 30, 154 Atl. 144.) It is apparent that Joe Tennes, in testifying that he went to sleep at the wheel, testified to a fact peculiarly within his knowledge. If Mrs. Tennes had known he went to sleep, she naturally would have wakened him. The defense witnesses, Albert and Leo Wiesman, did not testify that he went to sleep, or that he did not go to sleep. It would have been impossible for them to honestly testify one way or the other on this subject. This is a case between the plaintiffs and the defendant. The fact that the defendant had a contract with an insurance company could not affect the rights of the plaintiff. The issues in the case were made up by the pleadings. If Joe Tennes had defaulted, plaintiff would have obtained a default judgment against him. A default signifies a confession of the complaint. As defendant could admit the cause of action stated by suffering a default, it is obvious he may admit during the trial the facts making out a case against him. The defendant is a person of average intelligence and in possession of his mental faculties. He testified that he fell asleep while driving the car. Defendant

is bound by his testimony. The evidence affirmatively shows that Mrs. Tennes was in the exercise of ordinary care for her own safety and there was no evidence tending to show that she was guilty of contributory negligence. The evidence clearly shows that defendant was guilty of gross negligence and that such negligence was the proximate cause of the injuries suffered. So far as the liability of the defendant is concerned, there was no issue of fact to be determined by the jury and the court should have directed a verdict for the plaintiff.

Plaintiff insists that whether or not defendant carried liability insurance was irrelevant. In his argument to the jury Mr. Bloomingston, defendant's attorney, said, among other things:

"Now there are some things that nobody but an attorney would swallow; and if he swallowed them it would only be because he was kidding himself. Now one of the things is this: He is not her attorney, he is my client's attorney too. You have probably discovered that. If you haven't, why you ought to. My client comes on the witness stand here and tells you a story which is grotesque. [Then he proceeded to read at large the deposition of Mrs. Tennes, which of course was improper as the court ruled.] What was the purpose of telling that story. It was entirely different than three other people tell the story. Well, they say you don't have to whistle to a dead horse. By the same token you don't have to tell 12 intelligent people, such as I am looking at, just what the low down in this case is. Mr. and Mrs. Mont Tennes is suing a man that is an insurance broker for large sums of money."

It is apparent from defendant's brief that Mr. Bloomingston, the attorney who represented defendant in the trial court, was designated as his attorney by virtue of the terms of an insurance policy issued to the

defendant. However, so far as the plaintiff and the court were concerned, Mr. Bloomingston was representing the defendant and not the insurance company. Plaintiff was not a party to the insurance contract. The record presents the anomalous situation of a lawyer questioning the veracity of his own client. The effect of this was to inject a false issue into the case. The insurance company, without any formality of pleading or appearance, injected itself into the case in order to defend itself against liability under the policy that it issued to defendant. The law affords protection to insurance companies against fraud, but they cannot proceed in the manner disclosed by the record in this case.

Plaintiffs state that the court erred in refusing to give the following instruction:

"The court instructs the jury that the driver of an automobile is bound to keep a practically continuous look out while driving, but no such duty is imposed upon the passenger or guest. In the absence of knowledge of danger or facts which would give her such knowledge, a passenger or guest may properly rely on the driver to attend to the driving of the automobile. The primary duty of care for the safe operation, rest upon the driver. However, a guest is not relieved from the exercise of such care for her own safety as is reasonable under the circumstances."

We are of the opinion that under the facts of the case, this instruction should have been given.

In his petition for rehearing defendant states that the same act cannot be held to be both wilful and wanton conduct and negligence, either as a matter of law or a matter of fact, citing *Chicago, R. I. & P. Ry. Co. v. Hamler,* 215 Ill. 525, where the court said, (540):

"Negligence and willfulness are as unmixable as oil and water. 'Wilful negligence' is as self-contradictory as 'guilty innocence.' "

The *Hamler* case points out that "negligence is merely a word of denial and that 'care' is the positive word." In the recent case of *Bartolucci v. Falleti*, 382 Ill. 168, the court said that negligence and wilful and wanton conduct are not synonymous, citing the *Hamler* case. It is interesting to note the following observation in the *Hamler* case (538):

"The Supreme Court of Wisconsin also holds that no mere degree of carelessness or inadvertence constitutes gross negligence, (*Decker v. McSorley*, 116 Wis. 643), and that the term 'gross negligence' signifies willfulness, involving intent, actual or constructive, to cause injury, and if one is guilty of willful misconduct causing injury to another the former's fault is denominated gross negligence. (*Rideout v. Winnebago Traction Co.*, 101 N. W. Rep. 672.)"

Our Supreme Court in *Streeter v. Humrichouse*, 357 Ill. 234, said (238):

"Ill-will is not a necessary element of a wanton act. To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and conditions, that his conduct will naturally and probably result in injury. An intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness."

From the case of *Smithers v. Henriquez*, 368 Ill. 588, it appears that an action grew out of an automobile accident and that the declaration consisted of three counts, the first and third charging negligence and the second wilful and wanton misconduct. Judgment for plaintiff in the sum of $7,500 was entered upon a general verdict. The judgment was affirmed. Apparently, the at-

torneys and the Supreme Court in that case did not feel that there was anything inconsistent in sustaining a judgment based upon a verdict finding the defendant guilty upon the counts charging both wilful and wanton misconduct and negligence. The State of Wisconsin does not have a guest statute as does the State of Illinois. Under the law of Wisconsin all that plaintiff was required to prove was that Mrs. Tennes was in the exercise of due care for her own safety at and about the time of the occurrence, and that the defendant was guilty of negligence which was the proximate cause of the injuries and the elements of damages. Defendant testified that he had been feeling rather tired and drowsy and he admitted that he fell asleep while driving. In *Blood v. Adams*, 269 Mass. 480, 169 N. E. 412, 413:

"In the exercise of ordinary care, an operator of an automobile must be able to anticipate what is coming, to see what is present, and to remember what is past. Voluntarily to drive an automobile on a public street at any time of day or night with eyes closed or to yield to sleep while operating such kind of dangerous machine as is an automobile on a public highway, is to be guilty of a degree of negligence exceeding lack of ordinary care and is a manifestation of recklessness which may be found by judge or jury to be gross negligence within any reasonable definition of that phrase."

Defendant contends that on the record this court cannot find as a matter of law, notwithstanding the verdict of the jury, that the admitted fact of going to sleep was in and of itself and without reference to notice or warning of on-coming sleep or to other conditions, the proximate cause of the accident. Defendant states that what is the proximate cause of an injury is ordinarily a question of fact to be determined by the jury from a consideration of all attending circumstances, and that it can only arise as a question of law when the facts

are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inference to be drawn from them. In our opinion, reasonable men could not come to any other conclusion than that the proximate cause of the unfortunate occurrence was the fact that Joe Tennes became drowsy and fell asleep while driving. As pointed out in *Anthony v. Wheeler,* 130 Ill. 128, the practice of directing a verdict has generally arisen on instructions to find for the defendant in cases where it was thought the plaintiff had wholly failed to make proof of some material part of his case, but the practice extends to and allows a similar instruction on behalf of the plaintiff. In *Marshall v. John Grosse Clothing Co.,* 184 Ill. 421, the court said (425):

"It is also claimed that the court erred in instructing the jury to find a verdict for the plaintiff. As there was no conflict in the evidence, it was a question of law whether, on the facts, plaintiff was entitled to a verdict, and as there was no evidence tending to support any defense interposed by the appellant, the court properly instructed the jury to return a verdict for the plaintiff."

In *Barmann v. McConachie,* 289 Ill. App. 196, a judgment for plaintiff was upheld where the facts of the case showed that defendant permitted himself to go to sleep while driving. From the case of *Hendler v. Meadows,* 13 N. J. Misc. 684, 180 Atl. 399, it appears that plaintiffs were injured while riding in an automobile along Ocean avenue in Bradley Beach, New Jersey. The Supreme Court of New Jersey said (400):

"The other point is that it was error to direct a verdict. The testimony was that while driving along Ocean avenue the car suddenly swerved and struck the pole. There was testimony from Miss Zipkin that the driver stated at the time that he had dozed momentarily. The defendant offered no testimony as to the

manner of the happening of the accident. Appellants argue as if the direction were based solely on the proof of the admission that Hendler fell asleep, but this is not so. When a car proceeding along a street suddenly swerves into a pole with no apparent cause, and there is no attempt to explain the occurrence, no claim that any other car or person was involved or that there was a hidden defect in the car, but simply a situation where the driver, whether asleep or awake, steered into a pole, it cannot be said that reasonable minds could differ on the question of negligence. There was no error in the direction of verdicts.''

In view of the fact that the liability of the defendant was clearly proved by a judicial admission by him, we are of the opinion that it was the duty of the trial court to direct a verdict in favor of plaintiff. No good purpose would be served by remanding the case for a new trial. Apparently, the parties presented all the evidence that was available and there was no substantial dispute as to the facts. The plaintiff, First National Bank of Chicago, executor of the estate of Mont J. Tennes, deceased, proved actual expenses of $5,445.-60, which were not questioned by defendant either as to reasonableness or amount.

Because of the views expressed the judgment of the superior court of Cook county is reversed and the cause remanded with directions to enter judgment for the First National Bank of Chicago, executor of the estate of Mont J. Tennes, deceased, in the sum of $5,445.60, and that the case be submitted to a jury for the purpose only of determining the damages to be awarded to Ida B. Tennes, and against Joe Tennes, and for further proceedings not inconsistent with this opinion.

*Reversed and remanded with directions.*

KILEY, J., concurs.

Mr. Justice Hebel specially concurs with the conclusion of this court that the judgment of the superior court of Cook county be reversed, but does not agree with the direction that the cause be submitted to a jury for the purpose only of determining damages to be awarded to Ida B. Tennes, the plaintiff, against Joe Tennes, the defendant. (*John Deere Plow Co. of Moline v. Carmer,* 350 Ill. 104.)