# Richmond

## John L. Crawford v. William Henry Quarterman, III

## Alvis V. Perdue v. William Henry Quarterman, III

March 9, 1970.

Record Nos. 7053 and 7054.

Present, All the Justices.

*James C. Turk (Dalton, Poff, Turk & Stone, on brief), for plaintiff in error in Record No. 7053.*

*Charles H. Osterhoudt (Carl L. Langhammer, on brief), for plaintiff in error in Record No. 7054.*

*James L. Hutton; Jacque W. Pierce (Gilmer, Sadler, Ingram, Thomas and Sutherland; Frith & Pierce, on brief), for defendant in error in Record Nos. 7053 and 7054.*

HARRISON, J., delivered the opinion of the court.

William Henry Quarterman, III filed his motion for judgment in November, 1967 against defendants John L. Crawford and Alvis V. Perdue to recover damages for personal injuries sustained in an automobile accident that occurred in June, 1958. At that time plaintiff was 12 years old, Crawford was 15, and Perdue was an adult. Quarterman was a guest in an Oldsmobile automobile driven by Crawford which was involved in an accident with a Plymouth station wagon driven by Perdue.

The jury returned a verdict for $12,500 in favor of plaintiff against both defendants, and to the final judgment entered by the trial court, we awarded them writs of error.

While numerous assignments of error are made, the dispositive issues are whether the evidence sustains the verdict, and whether the jury was instructed correctly on the elements of damages.

The accident occurred on June 13, 1958 at approximately 5 P. M. at a point on Highway #221 near the Town of Hillsville in Carroll County. The highway is described as a hard-surfaced road approximately 22-24 feet wide, and as running in a general east-west direction.

Virginia State Trooper George A. Farthing, Jr., who investigated the accident, testified that the road was dry. He identified the locale of the accident as a point opposite "McGrady's Drive-In", a restaurant located on the north side of the highway.

The road in front of McGrady's is described as straight with a very slight upgrade as one travels in an easterly direction, as were the Crawford and Perdue vehicles. It was marked with broken lines indicating that eastbound traffic could pass.

The officer stated that the Crawford vehicle skidded 120 feet on the north or passing lane of the highway, went off the left or

north side of the road and travelled 180 feet in and through the driveway to McGrady's before coming back on the highway. It then travelled diagonally across the road from the north to the south side for 51 feet and then an additional 66 feet down a slight embankment until it overturned. All distances were approximations by the officer.

Crawford estimated his speed then at approximately 65 miles an hour. He stated to the officer "that he was travelling east on Route 221 and started to pass another vehicle [Perdue] and as he started to pass he saw his [Perdue's] signal light come on and he applied his brakes and lost control. He stated that he did not know if the other vehicle got into the westbound lane or not".

Perdue stated to the officer "that the vehicle [referring to Crawford's] was travelling much in excess of the speed limit and that he [Perdue] gave a signal for approximately 200 feet. He saw that the vehicle was going too fast to stop and he pulled off the right side of the highway". The Perdue automobile left no skid marks or marks of any kind on the highway.

There was no physical contact between the two vehicles.

Quarterman was 22 years old at the time of the trial. He testified that he and his friend, John Crawford, had been riding around the day of the accident. He recalled that the weather was clear and dry and that they were travelling on a straight, flat, 2-lane, concrete highway.

When asked if he recalled what happened, plaintiff responded:

"Well as we were coming down the highway we were traveling between 55 and 65 at the time and we started to pass this station wagon, Plymouth station wagon. . . . I noticed it was down the road a bit but I didn't pay much attention to it until we got right up on it. . . . As I can remember we was pulling out to pass it and as our fender got up even with his, almost to his rear end of the station wagon we seen a — . . . Well, as I can remember there wasn't any tail light on at the time but just as we got up there it come on and he started coming across the solid line, the dotted line or whatever it was."

Plaintiff further stated that he glanced over as Crawford started to pass the station wagon and at that time "I seen the light blink on but he didn't have it on prior to that I don't believe". This occurred, he said, when Perdue was in the right (south) lane and

Crawford was in the left (north) lane starting to pass. He thought the station wagon was across the line and into Crawford's lane.

Defendant John L. Crawford testified substantially as did the plaintiff. He estimated his speed at "55 or 60, maybe 65". He had a positive recollection that he did not see the signal light on the Perdue automobile before he got up behind it. His testimony as to when he first noticed the light was: "Yes, I noticed the signal light whenever the rear, my fender on my car, or dad's, was almost up to the rear of the door of his car. In other words, I just caught a glimpse of the signal light out of the corner of my eye."

When asked how he was able to notice the signal light if he was even with the rear of the Perdue automobile, he answered: "Well maybe—actually it was a '56 model Plymouth and it has a curved taillight and this is visible from the side and I saw it." He also stated that, to the best of his knowledge, the Plymouth vehicle pulled to the left across the center line. He estimated the Perdue car was driving "maybe 30 or 35" but said that it was just a guess, he did not know—much slower than he was driving. Crawford did not sound his horn before passing Perdue, but when he thought the Perdue car was coming over, he said he swerved to miss him.

Perdue said that he intended to pull into McGrady's for a cup of coffee and gave a signal for a left turn when he was about 250 feet west of the drive-in. He first noticed the Crawford vehicle when it was about 300 feet behind him, approaching at a high rate of speed which, based on the noise it was making, he estimated at between 80 and 85 miles an hour. He said the Crawford car was in the passing lane at the time. Perdue further stated that he started to make his left turn approximately 50 feet from the entrance to the drive-in and about that point Crawford went off the road.

Elsewhere in his testimony, Perdue said that he first turned his signal on about 250 feet from the entrance to the drive-in; that somewhere between that time and before reaching the entrance to McGrady's he heard the approaching Crawford vehicle and glanced into his mirror; that when he saw the car approaching at such a high rate of speed, he turned off his left turn signal, turned on the right turn signal and pulled the car off the road to let him pass; and that he was off the hard surface when Crawford passed him. He also stated that he had started to make a left turn but did not

complete it, and that he "never crossed the center part of the line at no time".

The jury found that Perdue was guilty of negligence proximately contributing to cause the accident and returned a verdict against him which has the approval of the trial judge.

■ The evidence amply supports the verdict against Perdue. If the testimony of Quarterman and Crawford is to be believed, Perdue, without giving a timely signal to the Crawford vehicle approaching from the rear, started to make a left turn at a point when that car was dangerously near. In fact Quarterman and Crawford both testified that their vehicle was almost even with the Perdue car when the latter crossed the center line, forcing Crawford to veer to the left and lose control.

According to the testimony of Perdue, he was preparing to make a left turn despite the fact he had noted a vehicle approaching from his rear at a speed of 80 to 85 miles an hour in the passing lane.

■ The jury also found that Crawford was guilty of gross negligence which proximately contributed to cause the accident. With this finding we cannot agree.

Admittedly the jury could have found from the evidence that the Crawford car was exceeding the 55-mile speed limit. The estimates of speed ranged from 55 to 65 by plaintiff and from 80 to 85 by Perdue. However, plaintiff testified that he was not concerned about the speed at the time and expressed no great concern about it at the trial. In fact his statement was that prior to the accident Crawford had slowed down from the speed at which he had been travelling.

His positive statement, which corroborated the testimony of Crawford, was that as Crawford was in the actual act of passing, with the vehicles almost abreast, the driver of the Perdue vehicle turned or veered to the left across the center line. It was this maneuver on the part of Mr. Perdue that caused the Crawford vehicle to turn left abruptly to avoid contact with the Perdue car. It was then that Crawford lost control of his vehicle.

Notwithstanding the evidence of excessive speed, plaintiff, by his own testimony, has pinpointed what he regards as, and what the evidence shows to be, the proximate cause of the accident—the left turn signal by Perdue, and the movement of his car to the left at a time when Crawford was just before or in the act of passing him. By this testimony he absolved his host Crawford of gross negligence.

Plaintiff cannot expect the court to disregard his testimony. His case can be no stronger nor rise any higher than his own testimony permits.

In *Crew v. Nelson*, 188 Va. 108, 114, 49 S. E. 2d 326, 329 (1948), we said:

"And, so, in a personal injury case, if the plaintiff, a person of average intelligence and in possession of his faculties, while detailing the circumstances of the accident, clearly and unequivocally testifies to facts which show as a matter of law that he has no case, he is bound thereby and cannot recover.

"Whether such has been the effect of the litigant's testimony must be determined from a fair reading of it as a whole, and not merely by reference to isolated statements which are adverse to his claim. See *Tignor v. Virginia Elec., etc., Co.*, 166 Va. 284, 290, 291, 184 S. E. 234, 236.

"Unless the testimony of the litigant shows clearly and unequivocally that he has no case, or where fair-minded men may differ as to the effect of his testimony, the litigant is not concluded thereby. In such a situation his testimony is to be considered by the jury along with all of the other evidence in the case. See *Tennes v. Tennes*, 320 Ill. App. 19, 50 N. E. (2d) 132, 139, and cases there cited."

To the same effect see *Massie v. Firmstone*, 134 Va. 450, 114 S. E. 652 (1922); *Bond v. Joyner*, 205 Va. 292, 136 S. E. 2d 903 (1964); *Scott v. Foley*, 205 Va. 382, 136 S. E. 2d 849 (1964); *Saunders and Rittenhouse v. Bulluck*, 208 Va. 551, 159 S. E. 2d 820 (1968).

A fair reading of the testimony of Quarterman, taken as a whole, shows that the proximate cause of the accident in which he was injured was the negligence of Perdue, and not the negligence of Crawford. Plaintiff's version of the accident corroborates the account given by Crawford. While there are minor discrepancies, the testimony of plaintiff and Crawford can be reconciled with that of Perdue. The testimony of all three is consistent with the on-the-scene investigation and report made by the police officer.

Defendants assign error to the action of the court in granting Instruction P-1[1]. Specifically, they object to so much of the instruc-

---

(1) "The Court instructs the jury that if from the evidence and the other instructions of the Court you find your verdict in favor of the plaintiff, then in

tion as allowed the jury to consider any deformity resulting to plaintiff and any humiliation or embarrassment associated therewith. They say there is no evidence in the record of these elements of damages.

Plaintiff was taken to a hospital in Galax immediately after the accident and remained overnight. About six days later, and because of back pain, he was taken to see Dr. Charles R. Duncan, of Radford, Virginia. Dr. Duncan's examination showed a muscle spasm in the lumbar dorsal region. X-rays were taken but did not show anything at the time. The doctor advised that, if symptoms persisted, he would like to take additional films.

Second films were taken on August 30, 1958 and showed a fracture of the 12th dorsal and 1st lumbar vertebrae. Dr. Duncan prescribed a "Taylor back brace", a metal frame with leather straps to hold the back rigid, which plaintiff wore for almost a year. When last seen by Dr. Duncan in July, 1959, plaintiff had not worn the brace for about six weeks. X-rays taken then showed that the fracture was almost completely healed.

At the suggestion of counsel, Dr. Philip C. Trout, of Roanoke, an orthopedic surgeon, examined plaintiff on September 15, 1959. Dr. Trout's examination did not show any evidence of muscle spasm or tenderness. X-rays were taken which reflected some difference in the fractured vertebrae and other vertebrae. He was of the opinion that this condition was due to the injury, but he could not say whether Quarterman would have any permanent disability.

Dr. Trout recommended that plaintiff limit his activities because of a possible disturbance in the growth of the vertebrae, and avoid

---

assessing the damages to which he is entitled you may take into consideration any of the following which you believe from the evidence to have resulted from the collision:

"1. Any bodily injuries sustained and the extent and duration thereof;

"2. Any effect of any such injuries upon his health according to its degree and probable duration;

"3. Any physical pain and mental anguish suffered by him in the past, and any which may be reasonably expected to be suffered by him in the future;

"4. Any deformity resulting to him and any humiliation or embarrassment associated therewith;

"5. Any inconvenience and discomfort caused in the past and any which will probably be caused in the future;

"and from these as proven by the evidence your verdict should be for such sum as will fully and fairly compensate the plaintiff for the damages sustained by him as a result of the collision, not to exceed the sum sued for in the Motion for Judgement."

strenuous contact sports until he reached full growth. Quarterman was seen by Dr. Trout a total of eight times between September, 1959 and the trial in 1968. The last time was on March 19, 1968 and prior to then, April 1, 1966.

Plaintiff testified that he wore the brace prescribed by Dr. Duncan constantly for one year and thereafter as needed. About three years prior to the trial he got an adjustable brace.

In high school plaintiff participated in track events, competing in the 220, low hurdles and the broad jump and said that this activity "didn't bother me a bit". At one time he held the state record for the broad jump. Plaintiff was first approved for the draft, but after submitting X-rays his classification was changed to 4-F.

Quarterman is presently employed at the Radford Arsenal where he does light maintenance work. He states that he wears his brace on occasions when his back bothers him from sitting too long.

The only evidence in the record of expenditures made by plaintiff personally, incident to the injury, is his testimony that he thought he had spent about $70 or $75.

Defendant Perdue argues that the verdict should be set aside as excessive. Defendant Crawford says that although the verdict of $12,500 may not be excessive, as a matter of law, it was much higher than any of the parties had expected. He points out that plaintiff was never hospitalized and according to both doctors had enjoyed a good recovery with no disability.

Both defendants argue that there is no evidence of any disfigurement or deformity from the injury and no evidence of any humiliation or embarrassment. With this contention we agree.

This exchange occurred between the trial judge and counsel when Instruction P-1 was being considered:

"Mr. Stone: We object to the granting of Instruction P-1 as amended on the basis that in Subparagraph 2 there is no evidence as to any future effect on the health of the Plaintiff; in fact, the doctor testified that he could not say with reasonable medical certainty that there would be any future disability. In Subparagraph 4 there is no evidence of any disfigurement or deformity and there has been no testimony by the Plaintiff as to humiliation and embarrassment associated with any effects from the injury.

"The Court: I am a little concerned with disfigurement. There is no evidence of disfigurement.

"Mr. Hutton: I have no objections to striking that out.

"The Court: Any deformity?

"Mr. Hutton: No, sir.

"Mr. Osterhoudt: Counsel for Defendant Perdue joins in the exception to the instruction as stated by counsel for Defendant Crawford."

It is apparent that the trial judge and counsel agreed there was no evidence of any disfigurement or deformity. Likewise, there is no evidence in the record that plaintiff had suffered any humiliation or embarrassment by reason of his back injury, and so much of the instruction as permitted the jury to consider these elements is erroneous.

We are unable to determine the extent to which the jury considered the erroneous part of the instruction and whether or not the amount of the verdict reflects such consideration.

In *Wagner* v. *Fiery*, 206 Va. 370, 373, 374, 143 S. E. 2d 876, 879 (1965), the crucial question concerned errors in instructions. There the court, speaking through Mr. Justice Snead, said:

"In *Parker* v. *Leavitt, Adm'r*, 201 Va. 919, 926, 927, 114 S. E. 2d 732 we said:

" 'Nothing is better settled in Virginia than that an instruction should not be given when there is no evidence tending to prove the facts upon which the instruction is based. 10 Michie Jur., Instructions, § 20, pages 213 *et seq.* and a multitude of cases cited.' [Cases cited.]

"The reason for this principle of law is given in 10 M. J., Instructions, § 20, p. 213 *et seq., supra*. There it is said:

" 'It has been repeatedly held that an instruction should not be given when there is no evidence tending to prove the facts upon which the instruction is based, for the reason that the tendency of such instruction is to mislead the jury by withdrawing their attention from the legitimate points involved in the issue. Juries are sufficiently prone to indulge in conjectures, without having possible facts not in evidence suggested for their consideration. And before either party is entitled to an instruction there must be more than a scintilla of evidence introduced.' "

Since we find that there was not sufficient evidence adduced to

prove deformity, humiliation or embarrassment, we hold that the granting of the instruction constituted prejudicial error.

We find no merit in the other assignments of error.

For the reasons stated, the judgment of the lower court is reversed, and the verdict of the jury is set aside. Finally judgment will be entered in favor of the defendant Crawford. Because of the error in granting Instruction P-1, the case is remanded as to the defendant Perdue for a new trial, limited solely to the amount of damages to which the plaintiff is entitled to recover of this defendant.

> *Reversed and final judgment (Record No. 7053).*
> *Reversed and remanded (Record No. 7054).*