37 F.3d 1495
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Matthew E. ROLLINS, an infant; G. Wade Rollins; Nancy Y.
Rollins, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee,
and Charles Rula, M.D.; Emergency Physicians of Tidewater,
Incorporated; Virginia Beach General Hospital, Defendants.
 No. 92-2235.
 United States Court of Appeals, Fourth Circuit.
 Argued March 30, 1993.
Decided Oct. 11, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. MacKenzie, Senior District Judge. (CA-91-173-N)
 Ashley Joel Gardner, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, Md., for appellants.
 Michael Anson Rhine, Asst. U.S. Atty., Norfolk, Va., for appellee.
 On Brief: Walter A. Oleniewski, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, Md., for appellants.
 Richard Cullen, U.S. Atty., Norfolk, Va., for appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and WIDENER and HAMILTON,
 OPINION
 PER CURIAM:
 
 
 1
 This case against the United States under the Federal Tort Claims Act, 28 U.S.C. Secs. 2671-80, is based on the medical care provided to Matthew Rollins at the Portsmouth Naval Hospital on August 21 & 22, 1988. The district court, sitting without a jury, held that under the Virginia Medical Malpractice Act,[1] Va.Code Ann. Secs. 8.01-581.1 to 581.20, the Rollins had not proven beyond a preponderance of the evidence that the physicians at Portsmouth Naval Hospital breached the standard of care. Reviewing the record in its entirety, we are of opinion that the district court's findings were not clearly erroneous, see Fed.R.Civ.P. 52(a), and we affirm.
 
 I.
 
 2
 During the week preceding August 21, 1988, Matthew Rollins, an infant, developed a soft, round mass in his left groin. A nurse or her pediatrician told Mrs. Rollins that the mass probably was a hernia and that unless Matthew developed a fever or other signs of illness the doctor could examine it on Matthew's next scheduled visit. During the afternoon of August 21 Matthew became ill. He vomited two or three times, became feverish, and appeared both lethargic and in pain. That evening when his skin began to turn gray and his lips blue, Mrs. Rollins rushed him to the emergency room at Virginia Beach General Hospital.
 
 
 3
 Dr. Charles Rula, the emergency physician on duty, first saw Matthew and noted that he was ill-appearing, had a high fever, was grunting, and had a painful look on his face. After physically examining him and getting a brief history from Mrs. Rollins, Dr. Rula assessed that Matthew may have an incarcerated inguinal hernia and that he may be septic.[2] Although Dr. Rula did not know the source of Matthew's fever, he suspected that it was due to the mass in Matthew's groin and consequently believed that a surgeon needed to see Matthew. Mr. Rollins was a lieutenant in the United States Navy, and Dr. Rula arranged for Matthew's transfer to Portsmouth Naval Hospital. Before the transfer Dr. Rula gave Matthew some children's Tylenol for fever, placed him on oxygen, and started him on intravenous fluids.
 
 
 4
 Matthew was admitted to Portsmouth Naval Hospital with a diagnosis of "possible incarcerated hernia, rule out sepsis," and Dr. Cruff, a surgeon, first saw him in the emergency room. Dr. Cruff checked Matthew's vital signs, did an initial assessment, and obtained a brief history from Mrs. Rollins. Dr. Cruff then examined Matthew and noted that his eyes, ears, and throat showed no signs of infection, that his neck was supple, his lungs were clear, his breathing was not labored, his abdomen was soft, and that he had bowel sounds. He also noted that Matthew's extremities were warm and that he could move them well, that he had good capillary refill and normal distal pulses, and that his neurologic exam was normal. Based upon his examination, Dr. Cruff concluded that Matthew had an infection and that the most likely source was an incarcerated and possibly strangulated hernia or an infected lymph node in Matthew's groin. However, to rule out any other possible causes of infection and obtain a second opinion, Dr. Cruff called Dr. Moore, a surgeon, and Dr. Britton, a pediatrician, to assess Matthew.
 
 
 5
 Dr. Moore examined Matthew in the emergency room, and his findings corresponded with those of Dr. Cruff. He believed that Matthew had either an incarcerated inguinal hernia or an infected lymph node in his groin and that other possible causes of infection should be ruled out. Dr. Britton's examination of Matthew was consistent with that of Drs. Cruff and Moore, and he ordered a spinal tap to rule out meningitis as a possible source of Matthew's infection. The spinal fluid was crystal clear, not cloudy as is often the case if meningitis is present, and initial laboratory tests indicated that its protein and glucose values were within normal limits. These results preliminarily ruled out meningitis as a source of infection and reinforced a belief that the groin mass was the most likely source of infection.
 
 
 6
 Prior to Dr. Britton's examination Drs. Cruff and Moore chose Gentamicin and Timentin as the antibiotics to administer to Matthew. Gentamicin was to cover most of the bacteria present from a possible incarcerated hernia of the small bowel and Timentin was to cover any staphylococcal infection from a possible infected lymph node in the groin. After Dr. Britton's examination, Drs. Cruff and Moore consulted him on their choice of antibiotics. Dr. Britton noted that Timentin was not approved for pediatric use and recommended Nafcillin as a substitute. The doctors selected these antibiotics specifically to treat Matthew for an infection due to an incarcerated hernia of the small intestine or an infected lymph node. They did not prescribe any antibiotics to treat meningitis because the spinal tap had effectively ruled meningitis out at that time. Dr. Whalen, head of pediatric surgery at Portsmouth Naval Hospital, approved the choice of antibiotics.
 
 
 7
 At approximately 6 a.m. Dr. Cruff, under the guidance of Dr. Whalen, operated on Matthew. The surgery revealed that Matthew did not have an incarcerated hernia and instead had a hydrocele of the spermatic cord that was not responsible for his illness. After surgery, Dr. Cruff called the pediatricians for a reevaluation of Matthew's condition, but he did not deem it an emergency because Matthew's condition was stable and seemed to actually have improved. Dr. Cruff also noted that Matthew was breathing comfortably, was asleep but easily aroused, and was pink in his extremities. At about 7:30 a.m. Matthew's fever increased, but the doctors were not alarmed because such a spike in temperature is a common postoperative reaction. As or just after the pediatricians were examining Matthew between 9:00 and 10:00 a.m. his condition began to rapidly deteriorate, and it became obvious that he had a severe infection. Shortly after 10:00 a.m. Matthew suffered an infarct and tissue death at the T-7 level, as a result of what was later determined to be hemophilus influenza or H-flu. Matthew now is permanently paralyzed from the chest down.
 
 
 8
 The Rollins filed suit claiming that the physicians at Portsmouth Naval Hospital breached the applicable standard of care and thus proximately caused Matthew's injury.[3] First they alleged that the doctors were negligent in failing to administer broad spectrum antibiotics to treat the original diagnosis of sepsis of unknown origin. Second, they alleged that the doctors should not have excluded meningitis from the working diagnosis despite the negative spinal fluid results. Finally, they alleged that the doctors should have administered broad spectrum antibiotics immediately after surgery and that the doctors should have treated Matthew's postoperative state as an emergency.
 
 
 9
 After hearing the evidence and considering the argument of counsel, the district court held that the Rollins had failed to prove by a preponderance of the evidence that the physicians at Portsmouth Naval Hospital breached the applicable standard of care. Consequently, the district court entered judgment for the United States. The Rollins now appeal.
 
 II.
 
 10
 When an action is tried upon the facts without a jury, the district court "shall find the facts specially and state separately its conclusions of law thereon ... [and these] [f]indings ... shall not be set aside unless clearly erroneous...." Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety...." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985). Finally, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings...." 470 U.S. at 575. Applying these principles to the facts of this case, we are of opinion that the district court's findings were not clearly erroneous.
 
 
 11
 To recover in a medical malpractice action, Virginia law requires a plaintiff through expert testimony to establish the standard of care,[4] to demonstrate that this standard has been breached, and to prove that "but for" this breach the injury would not have occurred. See Fitzgerald v. Manning, 679 F.2d 341, 346, 348 (4th Cir.1982) (applying Virginia law in diversity action). At trial, the Rollins sought to establish the standard of care through Drs. Gross and Freund. Both testified that the standard of care required the defendant to administer broad-spectrum antibiotics to treat sepsis of unknown origin. In addressing the testimony of the Rollins' experts the district court stated: "... Dr. Gross lost much of his credibility by suggesting to the Court that Timentin, a drug shown not to have been approved for pediatric use, would have been a better choice drug." The district court also found Dr. Freund's testimony incredible because he stated that Matthew's groin mass was an "insignificant physical finding", a statement contrary to the testimony of every other medical witness.
 
 
 12
 Although the district court did not specifically state the standard of care, we are of opinion that the district court did not err because this issue boiled down to a credibility determination. Credibility determinations of the district court are accorded great weight, see Fed.R.Civ.P. 52(a), Anderson, 470 U.S. at 575. The district court discredited the testimony of the Rollins' experts and relied on contrary testimony stating that the appropriate standard of care was to focus antibiotic coverage based on the particular diagnosis of the individual patient rather than based on a general diagnosis. This is supported by expert testimony in the record. Dr. Moore and Dr. Rubio, defendant's experts, testified that while broad-spectrum antibiotics generally should be administered to treat sepsis of unknown origin, Matthew's was not a general case of sepsis of unknown origin. They stated that the presence of the groin mass altered the standard of care and that the doctors appropriately aimed their antibiotic treatment at the groin mass after checking for other sources of infection. Dr. Cruff supported this by stating that he was trained to do a complete history and physical examination and then select antibiotics to cover the most likely source of infection. Although the district court did not address whether the administration of broad-spectrum antibiotics was the standard of care, we are of opinion that the district court's findings were sufficient and adequately addressed the circumstances of Matthew's case. See Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 576 (4th Cir.1985) (stating that "[a]ppellate courts generally, and wisely, have taken a flexible view about all these matters, eschewing hypertechnicality in assessing the sufficiency of particular findings made under this wisely non-specific rule directive.").
 
 
 13
 The Rollins next claim that several of the district court's findings were clearly erroneous. Based upon our review of the record, we are of opinion that the district court's findings were not clearly erroneous. The district court stated that Matthew's preliminary diagnosis included sepsis of unknown origin and found that the doctors almost eliminated meningitis because a spinal tap preliminarily ruled it out, and their examination revealed no other apparent signs or symptoms of infection except the groin mass at which the district court stated that the doctors appropriately directed their attention and chose antibiotics only to treat an infection caused by an incarcerated hernia or abscess. Finally, the district court stated that the weight of the evidence indicated that sweeping coverage of every possible differential diagnosis was not sound medical practice and that antibiotic treatment should be tailored to the symptoms of the particular individual. These findings are supported by expert testimony in the record, and after reviewing the record as a whole we can not say that the district court committed a mistake.
 
 
 14
 The Rollins next argue that the district court based its holding on an erroneous application of controlling law. We are of opinion that the district court correctly applied Virginia law, so we find no error. The Rollins argue that under Hicks v. United States, 368 F.2d 626 (4th Cir.1966), the defendant breached the standard of care by not treating sepsis of unknown origin. We are of opinion that such an argument misconstrues our holding. In Hicks, we held that a physician might be negligent when he failed to make inquiries with respect to the accepted standard. In the case at hand, the doctors concluded after a thorough examination that Matthew's illness was due either to an incarcerated hernia or an infected lymph node rather than sepsis of unknown origin. Although this diagnosis later proved to be erroneous, we are of opinion that the doctors satisfied the standard in Hicks. See Brown v. Koulizakis, 331 S.E.2d 440, 445 (Va.1985) (stating that "[a] physician is not an insurer of the success of his diagnosis and treatment nor is he held to the highest degree of care known to his profession.")
 
 
 15
 The Rollins further argue that Hicks requires a doctor to treat every life-threatening illness within a differential diagnosis. We are not persuaded by this argument. In Hicks, the patient exhibited signs that were consistent with either gastroenteritis or a high obstruction. See Hicks, 368 F.2d at 629. After examining the patient for 10 minutes the doctor in Hicks diagnosed gastroenteritis and prescribed drugs for relief of pain. See 368 F.2d at 628. Expert testimony at trial indicated that "according to prevailing practice in the community, the doctor should have inquired whether the patient had had diarrhea and should have made a rectal examination to determine whether the patient was suffering from an obstruction rather than from gastroenteritis." 368 F.2d at 629. In addressing the standard of care and whether the doctor breached it, we stated:
 
 
 16
 Thus, if he uses ordinary care in reaching his diagnosis, and thereafter acts upon it, he incurs no liability, even if the diagnosis proves to be a mistake in judgment.... It would seem, however, that where the symptoms are consistent with either of two possible conditions, one lethal if not attended to promptly, due care demands that a doctor do more than make a cursory examination and then release the patient.... The fact that an intestinal obstruction is a rare occurrence, and that some form of gastroenteritis is the more likely of the two conditions, does not excuse the failure to make inquiries and perform recognized additional tests that might have served to distinguish the one condition from the other.
 
 
 17
 368 F.2d at 629-30.
 
 
 18
 Based upon our holding in Hicks, we are of opinion that a doctor is not required to treat a life-threatening illness within a differential diagnosis if he or she eliminates it through proper examination and testing. In this case the differential diagnosis included incarcerated hernia, infected lymph node, and sepsis of unknown origin. Through its examination the defendant reasonably believed that sepsis of unknown origin was eliminated because there existed no apparent sources of infection other than the groin mass. Accordingly, the doctors addressed their treatment towards the groin mass. Although Hflu, the source of Matthew's infection, is more common than an incarcerated hernia or infected lymph node, the presence of the groin mass made the latter two much more likely as the source of infection in Matthew's case. This diagnosis later proved erroneous, but at the time the defendant properly chose to treat the groin mass as the source of infection and consequently satisfied the due care required under Hicks.
 
 
 19
 The Rollins finally argue that the district court improperly concluded that they failed to prove that the defendant's failure to administer broad-spectrum antibiotics after Matthew's surgery was a proximate cause of Matthew's injury. Under Virginia law, a plaintiff has the burden of proving, by a preponderance of the evidence, that "but for" the act or omission complained of the injury would not have occurred. See Fitzgerald, 679 F.2d at 348-49. When using expert medical testimony to prove causation, the testimony must be "stated in terms of a 'reasonable degree of medical certainty.' " Fitzgerald, 679 F.2d at 350 (quoting Crawford v. Quarterman, 172 S.E.2d 739, 744 (Va.1970)).
 
 
 20
 Based upon our review of the district court's decision and the record as a whole, we are of opinion that the district court did not err in holding that the Rollins did not prove by a preponderance of the evidence that the postoperative failure to give broad-spectrum antibiotics was a proximate cause of Matthew's injury. The only proof offered by the Rollins on proximate cause was the testimony of Drs. Gross and Freund. Dr. Gross stated that he believed the administration of broad-spectrum antibiotics in the early morning hours at Portsmouth Naval Hospital would have stopped the infection. Dr. Freund also stated that he would have administered broad-spectrum antibiotics on arrival at Portsmouth Naval Hospital. However, neither of them testified to a degree of medical certainty that postoperative administration of broad-spectrum antibiotics would have prevented Matthew's injury. And there was expert testimony that it would not have. Furthermore, and just as significant, the district court discredited much of their testimony and found that the weight of the evidence does not show that a change of the antibiotics after the surgery would have prevented Matthew's injury.
 
 
 21
 Without attempting to summarize each aspect of this case, the gist of our decision is that the bulk of the evidence in the case was taken orally before the district court, who saw the witnesses and heard them testify. The district judge gave more weight to the testimony from the critical witnesses for the defendant than he did to the testimony from the critical witnesses for the plaintiff. We are of opinion that the findings of fact of the district court are not clearly erroneous, and the conclusions of law of the district court are without reversible error, if error at all.
 
 
 22
 The judgment of the district court is accordingly
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 The Federal Tort Claims Act, 28 U.S.C. Sec. 2674, states that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the manner and to the same extent as a private individual under like circumstances...." When suit is filed under the Federal Tort Claims Act, the law of the jurisdiction where the tortious act allegedly occurred, in this case Virginia, is controlling. See Richards v. United States, 369 U.S. 1, 9-10 (1962)
 
 
 [2]
 Sepsis denotes an infection, Dr. Rula testified, the source of which could be an incarcerated hernia or an ear infection, boil, or any of a million different things
 
 
 [3]
 Originally the Rollins sued Dr. Rula, Emergency Physicians of Tidewater, Inc., Virginia Beach General Hospital, and the United States. After a compromise settlement, the district court dismissed all defendants except the United States
 
 
 [4]
 Virginia law states:
 In any proceeding ... to recover damages alleged to have been caused by medical malpractice where the acts or omissions so complained of are alleged to have occurred in this Commonwealth, the standard of care by which the acts or omissions are to be judged shall be the degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth....
 Va.Code Ann. Sec. 8.01-581.20.