**UNION LIVE STOCK SALES COMPANY, INC. and Bonded Sleep Products, Inc., Plaintiffs,**

**v.**

**The BALTIMORE & OHIO RAILROAD COMPANY, INC., a Maryland Corporation, Defendant.**

**Civ. A. No. C–74–5–P.**

United States District Court,
N. D. West Virginia.

Feb. 12, 1976.

---

John S. Bailey, Jr., Parkersburg, W. Va., for plaintiffs.

Fred L. Davis, Jr., Parkersburg, W. Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, Union Live Stock Sales Company, Inc., and Bonded Sleep Products, Inc., both West Virginia corporations bring this action against the Baltimore & Ohio Railroad Company, Inc., a Maryland corporation, for damages allegedly incurred in Parkersburg, Wood County, West Virginia under date of July 11, 1972 as a result of a building fire. The amount in controversy exceeds the sum of $10,000 exclusive of interest and costs, and is between citizens of different states. Jurisdiction over the matters is conferred upon the Court by virtue of 28 U.S.C. § 1332.

The parties have submitted an agreed statement of the facts, and fully briefed the issues of law in cross-motions for summary judgment. Since there is no genuine issue as to any material fact in the case, the Court deems the matter ripe for determination on the motions. Fed.R.Civ.P. 56. Stipulated facts are essentially as follows:

On July 11, 1972, the day of the fire, Union Live Stock Sales Company, Inc. [hereinafter Union] owned real estate which adjoined on the south a railroad switching yard owned and operated, for a long period of time prior to that date, by Baltimore & Ohio Railroad Company, Inc. [hereinafter B&O]. On Union's lot was located a two-story frame building housing a live stock auction facility constructed of cypress and red oak lumber. On the first floor of Union's building

were holding pens in which live stock was kept, a sales ring and other facilities. The second floor contained a restaurant, a five-room apartment, a veterinarian's office, Union's offices, and restrooms. The live stock sales held in the building were open to the public, and the grounds around the building were not fenced and the first floor, which was essentially opened, was never locked. Loose hay was often kept in the holding pens as food for the animals. The fire, which started in the northwest part of the building, spread rapidly throughout the entire facility, significantly damaging the entire building, killing at least 12 head of cattle and damaging a red cattle truck parked outside.

On the day of the fire, Bonded Sleep Products, Inc. [hereinafter Bonded] also owned real estate which adjoined B&O's switching yard on the south. On Bonded's lot was located a three-story brick building with a one-story annex, separated by a three-foot walkway from Union's live stock auction facility on the east. The annex was significantly damaged by the fire which commenced in Union's building.

The fire was started by one Kenneth George (hereinafter George] and Bradford Johnson [hereinafter Johnson], both children eight years of age. On July 11, 1972, George and Johnson entered the B&O's switching yard walking between the Union and Bonded buildings, and one or both of them entered into one of B&O's unlocked cabooses taking from two to five fusees or flares from the caboose. They lit one of the fusees and left it lying in the switching yard, left the switching yard and walked off the yard to a point in front of Bonded's building where a red cattle truck was parked. George lit a fusee and placed it upon the hood of the truck; it fell off, Johnson picked it up and threw it on the ground, and George snubbed it out. They started back along the walkway between Union and Bonded's buildings toward B&O's property when Johnson lit another fusee, and, after having been told by George that there was loose and flammable hay in the area, threw the lighted fusee through an open window into some loose hay located in a stock pen in Union's building. The loose hay caught on fire, spread to the whole of Union's building and damaged Bonded's building. The stipulated facts reveal that George and Johnson were two of several children that had previously used the switching yard for a playground. On July 10, 1972, the day prior to the fire, George and Johnson were taught how to light fusees by one Billy Keels [hereinafter B. Keels], ten years of age, and Jimmy Keels [hereinafter J. Keels], eleven years of age. On that day several fusees were lit by the boys and left burning in the switching yard. George and Johnson indicated that they had been in the yard on at least one prior occasion to July 10, 1972; B. Keels indicated that he had been in the yard about four times prior to July 10, 1972; and J. Keels indicated that he had been on B&O's property several times prior to July 10, 1972.

B. Keels had taken fusees from unlocked cabooses prior to July 10, 1972, two of which he had lighted in a school yard and one he had taken home and given to his mother. J. Keels had taken fusees from cabooses about every third time he was in B&O's switching yard. J. Keels had also been in the switching yard with his cousins and often with a young lad named Mark Parker. Keels and Parker stored some of the fusees they took in a "cabin" they had which was some distance from B&O's switching yard. The maximum number of fusees they had in their "cabin" at one time was approximately twelve. J. Keels and B. Keels found fusees which they took on open shelves or on tables in the cabooses. On one occasion prior to the fire, B. Keels and J. Keels played on a turntable in B&O's switching yard while men at work were close by. On another occasion Parker blew out the red and green signal lights and switched tracks.

The boys were never told to stay out of B&O's switching yard; they were never told it was permissible to be in

B&O's switching yard; and they saw no signs warning them to stay off B&O's property.

Additionally, on July 10, 1972, during the nighttime, five or six unidentified youths were in B&O's switching yard and took fusees from an unlocked caboose, lit them and scattered them on B&O's property for some distance lighting up the whole east end of B&O's switching yard. This incident was not reported to B&O's Terminal Trainmaster and he had no personal knowledge of this event. However, B&O's Yardmaster did report the incident to the B&O police. Usually, once an evening in the months of June and that part of the month of July preceding the fire, the B&O's Yardmaster had occasion to run young men and boys out of the switching yard.

B&O's Terminal Trainmaster had knowledge of boys being in B&O's switching yard on several occasions prior to the fire, but to the best of his knowledge, in each instance they were run off B&O's property. He had no personal knowledge of any missing or stolen fusees.

Fusees were kept by B&O in cabooses and in a storeroom in a roundhouse in its switching yard. The fusees which were kept in the roundhouse were kept in a storeroom which was locked. The fusees which were kept in the cabooses, some of which were unlocked, were in open boxes and were not secured in any manner.

B&O's switching yard was approximately 6,000 feet in length and varied from four tracks to twenty tracks in width. Its operations consisted of classifying cars of trains going through Parkersburg by adding cars to or removing cars from said trains; of repairing cabooses and other cars; and of repairing and fueling locomotives and equipping cabooses. During an average day, ten trains with a total in excess of 1,700 cars travel in and out of said switching yard, each train entering and leaving the yard with a caboose as its last car.

A caboose is a special type of railroad car furnished for the use of the train crew and storage of equipment necessary for the safety of the crew, the safe operation of the train and the safety of the public in general. In the switching yard, B&O parked and stored railroad cars among which were three cabooses regularly kept in the yard.

The operating rules of the B&O require each caboose to be equipped with certain convenience and safety appliances and equipment, including flags, warning devices, first aid equipment and fusees, which were manufactured by the Samuel Jackson Fusee Company, a corporation. Fusees are also known as flares and are used by all railroads primarily as signaling devices to indicate the movement of trains. Train crews are required to place lighted fusees on tracks to signal other trains that there may be danger ahead, and in many instances they must be left burning on tracks and railroad yards as well as in open country. Fusees of the same type as manufactured by the Samuel Jackson Fusee Company and sold to the B&O are also distributed by Samuel Jackson Fusee Company to retail outlets for resale to the general public. They are commonly used by police departments and trucking companies as well as the B&O and other railroads. They are not explosive. They give a steady, brilliant flame and are not affected by wind, rain or snow. There is no substitute for fusees as used by railroads.

Plaintiffs argue that B&O was negligent in the keeping and maintaining of fusees in its cabooses on its property when it knew or should have known that its property was frequented by mischievous children, and that such negligence was the proximate cause of the fire which destroyed and damaged the plaintiffs' real estate and personal property.

 The Court, sitting on the case by virtue of diversity jurisdiction, must apply the law of West Virginia. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). According to West Virginia law, the proximate cause of an injury is the last negligent act contributing to the injury,

without which the injury would not have resulted. *E. g., Dunning v. Barlow & Wisler, Inc.,* 148 W.Va. 206, 133 S.E.2d 784, 789 (1963); *Whitney v. Ralph Myers Contracting Corporation,* 146 W.Va. 130, 118 S.E.2d 622, 624 (1961); *Smith v. Penn Line Service, Inc.,* 145 W.Va. 1, 113 S.E.2d 505, 515–16 (1960); *Hutchinson v. Mitchell,* 143 W.Va. 280, 101 S.E.2d 73, 75 (1957). However, it has long been held in West Virginia that intervening acts of third persons may constitute a new and effective cause, which, operating independently of the defendant's negligence, can be said to be the proximate cause of the injury. *E. g., State of West Virginia ex rel. Poulos v. Fidelity & Casualty Company of New York,* 263 F.Supp. 88, 90 (S.D.W.Va.1967); *Evans v. Farmer,* 148 W.Va. 142, 133 S.E.2d 710, 718 (1963); *Smith v. Penn Line Service, Inc.,* 145 W.Va. 1, 113 S.E.2d 505, 516 (1960); *Hartley v. Crede,* 140 W.Va. 133, 82 S.E.2d 672, 679 (1954).

■ Recovery must be denied to plaintiffs in the instant case, for even assuming that the defendant was negligent in failing to adequately protect or secure its fusees so as to prevent unauthorized parties from tampering with them, the acts of George and Johnson constituted an efficient intervening cause. George and Johnson, although only eight years of age, knew that a burning fusee thrown among flammable materials would cause damage. The facts reveal that the fusee was intentionally thrown into Union's building after the boys discussed the flammability of the building's contents. They obviously may not have realized the extent of the calamity to be caused by their acts, but they were clearly cognizant of the fact that they were committing arson, an act that would lead to the destruction of another's property.

■ While it may have been foreseeable that the children would tamper with the fusees, even in a negligent fashion, it was not foreseeable that the children would use the fusees to commit tortuous or criminal acts.[1] See *State of West Virginia ex rel. Poulos v. Fidelity & Casualty Company of New York, supra,* 263 F.Supp. 88, 91 (S.D.W.Va.1967). The Court concludes, therefore, that the acts of George and Johnson in deliberately setting fire to the plaintiffs' buildings were a superseding and intervening cause of the actual destruction that occurred, regardless of whether the acts and omissions of the defendant in failing to lock up its fusees can be considered negligent. Cf., *McKinney v. Miller,* 138 W.Va. 324, 75 S.E.2d 854 (1953); *Shubert v. Thompson,* 32 N.E.2d 120 (Ind.1941); *Dabrowski v. Illinois Central Railroad Co.,* 303 Ill.App. 31, 24 N.E.2d 382 (App. Ct.Ill.1939).

An appropriate order will issue.

## ORDER

For the reasons stated in the memorandum this day filed and deeming it proper so to do, it is ADJUDGED and ORDERED that summary judgment be and the same is hereby awarded the defendant.

Said defendant stands dismissed with an award of costs.

Let the Clerk send copies of this order and the accompanying memorandum to all counsel of record.

---

1. The parties stipulated that the fusees were not "dangerous instrumentalities." Of this there can be little doubt. Fusees are commonly used as signals in the railroad industry, and like most tools can cause injury when improperly used. See *Dabrowski v. Illinois Central Railroad Co.,* 303 Ill.App. 31, 24 N.E.2d 382 (App.Ct.Ill.1939).