**Russell T. FITZGERALD, Appellant,**

v.

**Preston C. MANNING, Jr., M. D., Appellee.**

No. 78–1109.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1982.

Decided May 20, 1982.

T. David Thelen, Lovingston, Va. (Eggleston & Thelen, Lovingston, Va., Gordon W. Poindexter, Jr., Cooley, Poindexter, Burns & Marks, Waynesboro, Va., on brief), for appellant.

James G. Welsh, Staunton, Va. (Timberlake, Smith, Thomas & Moses, P. C., Staunton, Va., on brief), for appellee.

Before RUSSELL, HALL and MURNAGHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is a medical malpractice action. At the conclusion of the plaintiff's case, the defendant moved for a directed verdict. The District Court granted the motion and judgment for the defendant was duly entered. From that judgment, the plaintiff has appealed. We affirm.

The plaintiff's illness, with its consequent hospitalization and treatment resulting in this action, began with nausea as he was working on the second shift at the Westinghouse plant in Verona, Virginia, on August 17, 1972. Because of the nausea he went to the restroom. There he began to vomit "something black." He assumed at the time that he had merely regurgitated the hamburger, along with some beer, which he had had shortly before. Later, between ten and ten-thirty o'clock that night, he became ill again and "this time it was pure red blood" that he vomited. He reported his condition to his supervisor and requested permission to leave. Though given such permission, he remained at the plant until the shift change. At that time, he joined his fellow employee who was riding with him, and was proceeding through the parking lot to his car. He began vomiting blood profusely and almost constantly before reaching the car. His companion refused to allow him to go home in that condition and they went instead to King's Daughters' Hospital in Staunton. He arrived at the hospital at about one o'clock on the morning of August 18. The plaintiff had no regular physician and the hospital called the defendant who responded almost immediately and who remained continuously in attendance on the plaintiff for almost twenty hours steady.

After the plaintiff was admitted, and before the defendant had arrived at the hospital, a nurse had accumulated in a basin the blood the plaintiff had vomited after his arrival. When the defendant reached the hospital, he noted the basin of blood and inquired of the nurse on duty how long the plaintiff had been vomiting. When told, he directed that a blood sample be instantly taken and ordered blood for immediate transfusions, administered regularly over a four-hour period. The defendant also ordered that the plaintiff's blood pressure, respiration and pulse be noted each half-hour, that his urine output be followed, that his bleeding be monitored systematically, in the hope that bleeding might be stanched by normal remedies, and that an antacid be given him through a nasal tube each hour.

By early morning of August 18, the flow of blood from the plaintiff's mouth had not moderated. The defendant had already attempted without success to pump out the plaintiff's stomach. Dr. Pittman, an experienced internist with a specialization in gastroenterology, whose assistance the defendant had secured, attempted to arrest the blood flow by applying ice water lavage (or rinsing of the stomach) or, as the plaintiff described it, by "freezing" the stomach. Antispasmodic medication had also been prescribed. When none of these actions reduced substantially the flow of blood, the defendant made a provisional diagnosis of "probable acute bleeding, duodenal or gastric ulcer, some tumor, such as Leiomyoma, possible, alcoholic gastritis, doubtful," and concluded that there was "no alternative to operating [in order] to go in and see what was causing [the bleeding]." He accordingly advised the defendant that it appeared likely he had an ulcer and that an exploratory operation was necessary. After the defendant explained the operation to the plaintiff, the latter agreed to the operation and signed a written waiver to that effect.

The operation itself, performed during the morning of August 18 under a general anesthetic, was "designed primarily [for] exploratory" purposes. When the plaintiff's abdomen was opened in the course of this "exploratory" operation and the stomach was examined, a large clotting of blood was observed in the upper part of the stomach. The defendant removed these blood clots and, in the course of so doing, discovered a few superficial stomach lacerations which he sutured. These lacerations he determined could not have caused the bleeding. "[I]t was apparent" at this point in the examination, "that a good bit of the

bleeding was coming from the esophagus." The defendant requested Dr. Pittman's advice on the use of esophagoscopy (inspection of the esophagus through a lighted tube through which bleeding sites can be visualized) and the use of a Senstaken-Blakemore tube. Dr. Pittman recommended against esophagoscopy until the incision was enlarged. His advice was accepted by the defendant.

While Dr. Pittman was "scrubbing" preliminary to assisting the defendant in an examination of the plaintiff's esophageal area, the defendant, in an effort to stop the flow of blood, attempted without success to insert a Senstaken-Blakemore tube (a device containing two balloons which, when inflated, permits pressure to be applied to the walls of the esophagus or stomach, or both, in order to stop bleeding from small lacerations or bleeding sites on the walls of these parts of the bowel) in plaintiff's abdomen. When Dr. Pittman was in position to assist the defendant during the examination of the esophageal area, the defendant proceeded to enlarge the excision, and opened the lower stomach. Using an esophagoscope, both Dr. Manning and Dr. Pittman checked the esophageal area. They found no lesion or bleeding sites. The defendant then placed the Senstaken tube in the esophagus, inflated it properly and closed the esophagus.

Anxious that he had done everything he could under the circumstances to alleviate the plaintiff's condition, the defendant at this point telephoned Dr. Harry Wellons, a thoracic cardiovascular surgeon at the University of Virginia Hospital at the University of Virginia in Charlottesville, for any "suggestions he might have for management [of plaintiff's case] in case of further bleeding." As the defendant recalled it, Dr. Wellons had "no specific" suggestions "except that we should esophagoscope the patient before carrying out any exploration if the patient bled again ... [and] that we make a tube gastrostomy [that is an opening in the stomach through which we put a tube leading to the outside] to check more easily on any recurrent bleeding and to allow any nasogastric tube to be removed after a day or two." Dr. Wellons, in his testimony said that "[t]he only specific recommendation that [he could] recall [giving the defendant was] the performance of the gastrostomy." The suggestion of Dr. Wellons for the use of a tube gastrostomy was immediately followed.

After the operation on August 18, the defendant followed closely the plaintiff's condition. By August 21, the Senstaken tube had been removed but not the chest tube for drainage. The defendant was preparing to take a short vacation, which had been long planned. Before doing so, he reviewed carefully the plaintiff's condition. No evidence of further bleeding was observed at the time, the "[c]hest [of the plaintiff] was essentially clear," the plaintiff's "[p]rogress [appeared] satisfactory" and there was, in the opinion of the defendant, no "reason to suspect that [the] plaintiff's esophagus might not be intact." The defendant's opinion was confirmed by the nurse's notes, which characterized the plaintiff's condition as "good", though he complained of "being thirsty" and the "[t]ubes [were] bothering him." The defendant concluded under these circumstances and without any evidence of a fistula, that it was advisable to provide the plaintiff with some nourishment. He accordingly directed that the patient be permitted to have "clear liquids with milk." The defendant, in addition, gave orders for the irrigation with sterile saline solution regularly of the gastrostomy tube. After giving these orders at about midday of August 21, the defendant departed for his planned vacation, leaving the patient in the care of his partner, Dr. Todd, an older and more experienced surgeon.

Dr. Todd visited the plaintiff once in the afternoon and a second time in the early evening of August 21. He ordered an x-ray of the patient to be taken the next morning (August 22). At 7:30 on the morning of August 22, Dr. Todd visited the patient again. He noted on this occasion a significant increase during the night in the drainage through the chest tube. He concluded from this that there had developed "a leak

through the wound in the esophagus, which was draining to the outside" and, on that basis, ordered all mouth feeding discontinued. The reason for such order was to prevent any leakage of food from the esophagus into the pleural cavity through the cavity. Dr. Todd further ordered that antibiotics be administered in order to overcome any possible infection that might develop. From this point on, the plaintiff's condition remained under constant observation by both Dr. Todd and Dr. Pittman until August 28. By the 26th or 27th it was thought that an infection of the lung had developed and additional antibiotics were ordered.

On August 28, the defendant returned. He became concerned when he visited the plaintiff that the latter's condition might be adversely affected by malnutrition. He hesitated to use intravenous feeding at the time because of the difficulty of hyperalimentation with all the chest drainages and the continued openings in the plaintiff's chest and abdomen. He determined under the circumstances to permit gastostomy feeding. He explained that it was important to feed the plaintiff since "one of the main ways in which people get over infections and heal fistulas, despite the continuing infection, is to have adequate nourishment." At the same time, he ordered an x-ray, which indicated that there was continued leakage. Grape juice was substituted in the feeding in order to confirm this indication of continued leakage. A constant x-ray was made and plaintiff was given albumin. Other x-rays were taken in a continuing effort to localize empyema (infection), but without success.

During all this period the defendant, Dr. Todd and Dr. Pittman were repeatedly seeing the plaintiff and joining in prescribing a steady procession of treatment. The chest tube used for drainage was regularly irrigated and the plaintiff's dressing was systematically changed either by the nurses or by the defendant himself. Finally, on September 15 with plaintiff's condition appearing to deteriorate, the defendant requested and Dr. Wellons agreed to accept the plaintiff at the University Hospital in Char-lottesville. The first thing that Dr. Wellons did, after the plaintiff's arrival at the University hospital, was to make sure the "fistula was not [still] present." He did this "by use of a dye marker," in much the same manner as the defendant had earlier used grape juice for the same purpose. He followed this test up with "a barium swallow," used in the same way. Neither confirmed "the presence of a fistula at that time." Chest tube replacements were made, a regimen of antibiotics was begun and feeding by mouth begun. During this time, the University hospital's treatment "was quite similar" to that which the record indicated had been followed at King's Daughters' Hospital, though, as Dr. Wellons explained, "one would have to realize that some of the elements were different, in that we [meaning Dr. Wellons and his associates] knew shortly after his admission that he did not have a fistula, so that would allow different options as far as alimentation, et cetera, but in terms of treatment of the chest, the empyema, it was simply a matter of other attempts to establish drainage and leading up to the operation.".

When it became evident that "satisfactory drainage of the chest" was not being achieved, an exploratory chest operation was performed on September 29, two weeks after the plaintiff's admission to the University Hospital. This was, in Dr. Wellons' words, "an extremely difficult operation," in the course of which "many areas of pus [infection] that were not being drained by the tubes that we had put in" were discovered. These "areas of pus" or infection "had severely damaged the lower lobe of the lung," necessitating the removal of such lower lobe. As a "secondary effect of the accumulation of blood after the operation in the space," the chest became infected, winding up "with an empyema, or infection in the pleural space, which required, before his discharge on his first admission to the University [hospital], open drainage of this space." He was discharged from the hospital on November 2 with drainage tubes in his chest space.

On March 7, the plaintiff was readmitted to University hospital because he "was showing some signs of continued infection, pulmonary infection." The chest was opened. The remainder of the left lung was found to be "pretty much destroyed by infection" and was removed. Later, the customary Claggett's procedure (a process of sterilizing against infection the space created by the removal of the lung), used whenever a lung is removed, was performed. At the time of trial, this procedure has been repeated some four times but Dr. Wellons expressed encouragement that it had been "seven months now without any, apparently without any [further] problems." Subsequent to the Claggett's operation, the plaintiff filed this malpractice suit.

■ A *prima facie* case of medical malpractice such as the plaintiff asserted "must normally consist of evidence which [1] establishes the applicable standard of care, [2] demonstrates that this standard has been violated, and [3] develops a causal relationship between the violation and the harm complained of." *Kosberg v. Washington Hospital Center, Inc.*, 394 F.2d 947, 949 (D.C.Cir.1968); *Luna v. Nering*, 426 F.2d 95, 98 (5th Cir. 1970); *Rogers v. Okin*, 478 F.Supp. 1342, 1384 (D.Mass.1979). *What* is such standard of care, *whether* it has been violated, and *whether* such violation is the proximate cause of plaintiff's injury—in short, the substantive elements of a medical malpractice suit—are all questions to be determined by state law in a diversity action, *Hoyle v. Southern Bell Tel. & Tel. Co.*, 474 F.Supp. 1350, 1356 (W.D.N.C.1979), aff'd 631 F.2d 728 (4th Cir. 1980); *Union Live Stock Sales v. Baltimore & O. R. Co.*, 409 F.Supp. 50, 53–54 (N.D.W.Va.1976, Merhige, J., by designation). On the other hand, whether there is sufficient evidence to create a jury issue of those essential substantive elements of the action, as defined by state law, is controlled by federal rules, *Bryan v. Merrill Lynch, Pierce, Fenner & Smith*, 565 F.2d 276, 281 (4th Cir. 1977); *Wratchford & S. J. Groves & Sons Company*, 405 F.2d 1061, 1066 (4th Cir. 1969); *Owens v. International Paper Co.*, 528 F.2d 606, 609 (5th Cir. 1976).[1]

■ Since this action arose prior to July 1, 1976, the applicable standard of care required under Virginia law was that recognized prior to the enactment of § 8.01–581.-20, Virginia Code (1981 Supp.), *Noll v. Rahal*, 219 Va. 795, 250 S.E.2d 741, 746 (1979), *Maxwell v. McCaffrey*, 219 Va. 909, 252 S.E.2d 342, 345 (1979).[2] Under that rule, a physician or surgeon was required to "exhibit only that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities, at the time." *Reed v. Church*, 175 Va. 284, 8 S.E.2d 285, 288 (1940); *Maxwell v. McCaffrey, supra*, 252 S.E.2d at 345; *Easterling v. Walton*, 208 Va. 214, 156 S.E.2d 787, 790 (1967).[3] And

1. The Court in *Owens* pithily stated the principle thus:

 "*What* they [the plaintiffs] needed to prove to make a jury case is, of course, to be measured by [state] substantive law. *Whether* they proved such a case is a matter of federal procedural law .... (Italics in opinion)"

2. Since the trial of this case Virginia law has by statute changed the definition of standard of care in medical malpractice suits to provide that such standard "shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth; ... provided, however, that the standard of care in the locality or in similar localities in which the alleged act or omission occurred shall be applied if any party shall prove by a preponderance of the evidence that the health care service and health care facilities available in the locality and the customary practices in such locality or similar localities give rise to a standard of care which is more appropriate than a statewide standard...." § 8.01–581.20, Code of Virginia (1980 Amend.).

3. In *Easterling* the Court said:

 "A physician or dentist is not an insurer of a cure, and an unfavorable result may be attributable to a cause for which he was not responsible and may happen notwithstanding the exercise of a very high degree of care and skill. As a general rule, all that the law demands is that a physician or dentist exercise that degree of skill, care, knowledge and attention ordinarily possessed and exercised by members of the profession in his community under like circumstances; and as to those matters involving professional skill and

such standard of care is to be established by expert testimony. Nor is this standard violated "because an expert disagrees with a defendant as to what is the best or better approach in treating a patient. Medicine is an inexact science and eminently qualified physicians may differ as to what constitutes a preferable course of treatment. Such differences as to preference do not amount to malpractice. To constitute malpractice, the proffered expert must testify clearly that there has been a departure from acceptable medical standards," as followed by "ordinary, prudent practitioners in [the defendant's] field and community, or in similar communities." *Rogers v. Okin, supra,* 478 F.Supp. at 1385; *Reed v. Church, supra,* 8 S.E.2d at 288.

In order to establish a standard of medical care as well as a violation of such standard, expert testimony is required.[4] In order to qualify as an expert competent to provide such testimony, the witness must show familiarity with the "degree of skill and care" employed by the ordinary, prudent practitioner in the relevant field and community. *Maxwell v. McCaffrey, supra,* 252 S.E.2d at 345; *Noll v. Rahal, supra,* 250 S.E.2d at 744–45; *Little v. Cross,* 217 Va. 71, 225 S.E.2d 387, 390 (1976); *Bly v. Rhoads,* 216 Va. 645, 222 S.E.2d 783, 788–89 (1976); *Murphy v. Dyer,* 409 F.2d 747, 749 (10th Cir. 1969). And this requirement has been strictly applied in Virginia. In *Bly v. Rhoads, supra,* 222 S.E.2d at 788–89, the expert was a recognized authority on the national standards relevant to the particular medical area involved but his want of

familiarity with practice of medicine in Prince William County, where the action arose, disqualified him as an expert witness. In *Little v. Cross, supra,* 225 S.E.2d at 389, the expert witness practiced internal medicine in Washington and taught that subject at Howard University College of Medicine. He was disqualified in a medical malpractice suit arising in Norfolk because "his knowledge of the professional standards required of ear specialists in Norfolk in 1968" was not sufficient. *Id.* at 390. In *Noll v. Rahal, supra,* 250 S.E.2d 741, the Court refused to consider "the medical communities of Richmond-Henrico and Fairfax County" as "similar" within this rule of standard of care without specific evidence of such similarity. *Id.* at 744, n.2. Nor are these Virginia cases unusual in their strict application of the locality rule. Thus, in *Murphy v. Dyer, supra,* 409 F.2d at 749, the witness was "a renowned anesthesiologist," who had "written texts on the art, science and practice of anesthesiology" which were "the standard texts in [that] speciality in medical schools." But, in determining his qualification to testify as an expert on the standard of care to be observed by an anesthesiologist practicing in Colorado Springs, Colorado, the question was "not whether he was a renowned expert but whether, as such, he was familiar with the standards of practice and particularly the techniques employed in Colorado Springs or similar communities." Applying that test, the district court disqualified him as an expert witness because of a lack of familiarity with local standards. That ruling was affirmed on appeal. In essence, then, the standard of due care by a

---

attention, unskillfulness and negligence must be shown by the testimony of those learned in the profession." [p. 790]

4. *Easterling v. Walton, supra,* 156 S.E.2d at 790; *Hunter v. Burroughs,* 123 Va. 113, 96 S.E. 360, 369 (1918); *Speer v. United States,* 512 F.Supp. 670, 675 (N.D.Tex.1981); *Rogers v. Okin, supra,* 478 F.Supp. at 1384; 61 Am.Juris.2d § 348, pp. 509–10.

The standard statement of the rule is the language of Judge (later Chief Justice) Taft in *Ewing v. Goode,* 78 F. 442, 444 (C.C.Ohio 1897), a medical malpractice action involving the application of the scintilla rule in determining sufficiency of evidence:

"... when a case concerns the highly specialized art ... with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, *it is not enough to show that the injury, together with the expert opinion that it might have occurred from negligence and many other causes.* (Emphasis added)"

defendant in a medical malpractice case under Virginia law, as applicable to this case which arose before July 1, 1976, is the one followed by an "ordinary, prudent practitioner" in the same field and community, or similar community, as the defendant, as necessarily established by expert testimony. Only if the practice or procedure followed by the defendant in the particular situation departed from that customary practice, as established by competent expert testimony, is the defendant to be charged with a violation of the required standard of care, *i.e.*, negligence.

■ Assuming that a plaintiff has established a *prima facie* case of a departure by the defendant in his treatment of the plaintiff from that followed "by the ordinary, prudent practitioner in his field and community, or similar communities," the plaintiff must next satisfy by his proof the causation requirement. While there are two tests adopted by the courts for determining causation in this connection,[5] it seems agreed by both plaintiff and defendant that the rule in Virginia is the one generally characterized as the "but for" rule as accurately stated in *Wells v. Whitaker*, 207 Va. 616, 151 S.E.2d 422, 428 (1966), and recently reiterated in *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 267 S.E.2d 143, 147 (1980),

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred."

This rule as to proximate cause

"encompasses two elements (1) cause in fact, and (2) foreseeability .... Both elements must be present .... Cause in fact as an element of proximate cause means that the negligent act or omission

was a substantial factor in bringing about the injury and without which no harm would have been incurred .... Foreseeability is satisfied by showing that the actor as a person of ordinary intelligence should have anticipated the danger to others by his negligent act ...."

*Speer v. United States*, 512 F.Supp. 670, 678 (N.D.Tex.1981).

■ But the plaintiff argues—and this is actually the heart of his appeal—that the "but for" rule, while normally controlling, is subject to an exception in "one situation: where two causes concur to bring about an event and either alone would have been sufficient to bring about an identical result." This exception, pressed by the plaintiff, finds its basis in a footnote in *Wells*, 151 S.E.2d at 428, n. 1, which, in turn, relies on Prosser, *Torts*, 243 (3d ed. 1964). However, as Prosser at 245 pointedly observed, the plaintiff under this exception "must introduce evidence which affords a reasonable basis for the conclusion that *it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.* A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant (Italics added)"[6] And there are many examples of the application of this rule in medical malpractice cases, that, where there are a number of possible causes for a plaintiff's disability, the physician's negligence will be regarded as the proximate cause only if the evidence is that it is "more likely" or "probable" that his negligence was such cause than the other possible causes. Illustrative of these examples is *Dick v. Lewis*, 506 F.Supp. 799, 805 (D.N.D.1980), aff'd 636 F.2d 1168 (8th Cir. 1981).

---

5. In *Dick v. Lewis*, 506 F.Supp. 799, the Court said:

"Courts have generally applied one or both of two tests in determining whether factual causation exists. Under the 'but for' or 'sine qua non' rule, the defendant's conduct is not a cause of the event if the event would have occurred without it.... The other test for

determining causation in fact is the 'substantial factor' rule. Under it, the defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about."

6. *See, also, Ewing v. Goode, supra*, 78 F. at 444.

In *Dick*, the question in issue was whether the failure of the defendant physician to perform a caesarean section was a proximate cause of the plaintiff's cerebral palsy. In dismissing plaintiff's complaint, the Court said:

> "It has not been shown by a fair preponderance of the evidence that Steven's cerebral palsy would not have occurred if a caesarean section had been performed. Nor has it been shown that failing to perform a caesarean section was a substantial factor in bringing about Steven's condition. In establishing proximate cause, the plaintiff must adduce evidence that shows plaintiff's theory of causation is reasonably probable, not merely possible, and *more probable than any other theory based thereon.* ... In light of the factual findings of the court, plaintiff has failed to meet this burden. Speculation and conjecture are not sufficient to establish causation.... (Emphasis added)."

In *Bryant v. Rankin*, 468 F.2d 510, 515 (8th Cir. 1972), another medical malpractice action in which causation was the issue, the Court said:

> "[T]he issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence.... But the evidence adduced by the plaintiff must show that 'plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based thereon. It is not necessary that the proof be conclusive or exclude every other suggested or possible cause.' "

Again in *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634, 639 (8th Cir. 1971), which was also a medical malpractice suit, the Court said:

> "The plaintiffs of course also have the burden of proof on the issue of the fact of causation and must introduce evidence which affords a reasonable basis for one to conclude that it is more likely than not that defendant's conduct was a substantial factor in bringing about the result. 'In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused.' ... Proof of causation cannot rest on conjecture and the mere possibility of such causation is not enough to sustain the plaintiff's burden of proof .... Furthermore, when the causal relation issue is not one within the common knowledge of laymen, causation of fact cannot be determined without expert testimony."

The Virginia decisions are in line with these decisions. Thus, in *Dishman v. Pitts*, 202 Va. 548, 118 S.E.2d 509, 512 (1961), a medical malpractice case, the Court said "that in order for the plaintiff to prevail the evidence must show something more than that the injuries complained of may have resulted from one of two causes, for one of which the defendant is responsible and for the other of which he is not." In *Hunter v. Burroughs, supra*, 96 S.E. at 369, the Court used almost verbatim the language from Prosser, quoted *supra*, holding that, where there are several causes of an injury in a medical malpractice case, one of which may have been the negligence of the defendant, submission of the cause to the jury on causation is proper only if there is evidence that the injury "was more probably due to lack of skill or negligence of the defendant" than to other causes. *See also to the same effect, Lane v. Hampton*, 197 Va. 46, 87 S.E.2d 803, 805 (1955).

The reason for this requirement in a medical malpractice suit that the physician's action must be shown to be more likely than not to have been a proximate cause of the plaintiff's injury was stated in *Karp v. Cooley*, 349 F.Supp. 827, 839 and n. 1 (S.D.Tex.), *aff'd*, 493 F.2d 408, *rehearing en banc denied*, 496 F.2d 878, *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1979):

> "In determining proximate cause, the proof must be beyond a showing of possibility that the injuries arose from the defendant's negligence or lack of skill, since a jury may not speculate as to the cause of the injury."

 Just as negligence or violation of the standard of care must ordinarily rest on expert opinion evidence, so proof of causation—that is that the defendant's negligence was "more likely" or "more probably" the cause of the plaintiff's injury—requires expert testimony.[7] The reason for such requirement was stated in 61 Am.Juris.2d § 348, p. 509–10:

> "Inasmuch as the causes of the injuries ordinarily involved in malpractice actions are determinable only in the light of scientific knowledge, it has been recognized that expert testimony is usually necessary to support the conclusion as to causation." [8]

The only exception to this requirement of expert testimony is the unusual case "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge," 61 Am.Juris.2d, § 350, at p. 513, or where the resolution of the issue of negligence and causation "would not extend the jury beyond the range of ordinary lay knowledge and experience," *Washington Hospital Center v. Butler*, 384 F.2d 331, 336 (D.C.Cir.1967). It is plain that this case under review, described by one of the expert witnesses as one presenting a medical condition of "notorious difficulty," is not one within "the range of ordinary lay knowledge and experience" and accordingly depended necessarily for its establishment on expert testimony relating both to standard of care and causation.

 Moreover, in order to qualify on causation, the opinion testimony of the medical expert may not be stated in general terms but must be stated in terms of a "reasonable degree of medical certainty." *Crawford v. Quarterman*, 210 Va. 598, 172 S.E.2d 739, 744 (1970); *Lindsey v. The Clinic for Women*, 40 N.C.App. 456, 253 S.E.2d 304, 311 (1979). Only if the opinion evidence on causation, as offered by the plaintiff, rises to the level of a "reasonable degree of medical certainty" that it was more likely that the defendant's negligence was the cause than any other cause, is there sufficient evidence on causation to permit jury submission of causation. The basis for requiring such specificity in the opinion of the expert witness in a medical malpractice suit was clearly put in an often cited case, *McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971):

> " ' * * * [T]he expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence (citing cases).' [Quoting from *Menarde v. Philadelphia Trans. Co.*, 376 Pa. 497, 103 A.2d 681 (1954)].

> "The issue is not merely one of semantics. There is a logical reason for the rule. The opinion of a medical expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion. For a fact finder to award damages for a particular condition to a plaintiff it must find as a fact that that condition was legally caused by the defendant's conduct. Here, the only evidence offered was that it was 'probably' caused, and that is not enough. Perhaps in the world of medicine nothing is absolutely certain. Nevertheless, doctors must make decisions in their own profession every day based on their own expert opinions. Physicians must understand that it is the intent of our law that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient

**7.** *Hegger v. Green*, 646 F.2d 22, 29 (2d Cir. 1981); *Speer v. United States*, 512 F.Supp. at 675; *Rogers v. Okin*, 478 F.Supp. at 1385; *Taber v. Riordan*, 83 Ill.App.3d 900, 38 Ill.Dec. 745, 403 N.E.2d 1349, 1353 (1980); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 832 (1980); 61 *Am.Juris*.2d, § 348, pp. 509–10.

**8.** *See, also*, Annotation, "Proximate Cause—Malpractice Actions," 13 A.L.R. 11 at 31.

certainty so as to make a legal judgment." [9]

And the plaintiff in this case seems to have recognized that, for the medical opinion of his expert witness to meet the legal requirements for admissibility on causation, that opinion had to be couched, as *Lindsey* puts it, in terms of a "reasonable degree of medical certainty" that it was more likely than not that the defendant's action was the cause of plaintiff's injury. This is plain from the form in which plaintiff's counsel phrased his hypothetical questions on causation as directed by him to his expert witness, Dr. McGuire. In all of these questions, counsel requested the expert's opinion, expressed "with a reasonable degree of medical certainty" on whether it was "more likely than not" that it was the defendant's action which "*caused the plaintiff's* lung infection." It would appear, therefore, that the authorities establish, and the plaintiff accepts, the rule that only if the opinion evidence on causation, as offered by the plaintiff, rises to the level of a "reasonable degree of medical certainty" that it was more likely that the defendant's negligence was the cause than any other cause, is there sufficient evidence on causation to permit jury submission on causation.

The plaintiff in this case has proffered expert testimony, which he contends established both a violation of the appropriate standard of care on the part of the defendant in his treatment of the plaintiff and that such violation was the proximate cause of his loss of a lung. Other than the defendant himself, who was examined as an adverse party, the plaintiff proffered but two medical witnesses on these points. The first of these was Dr. Wellons whose testimony was primarily directed towards establishing his own treatment of the plaintiff after the latter's transfer to the University Hospital. There is nothing in his testimony which would support a claim of negligence or of causation in connection with the defendant's treatment of the plaintiff. The other medical witness was Dr. McGuire, the head of surgery at the Medical College in Richmond. It is on his testimony and his testimony alone that the plaintiff chose to rely to establish the several elements of his cause of action.

Unlike Dr. Wellons, Dr. McGuire had not seen the plaintiff during his sickness and he rested his conclusions on a review of the hospital records made on the eve of the trial itself and on hearing the defendant's testimony at trial. He began his testimony by characterizing the plaintiff's case as one presenting "a unique [medical] situation," one which he (the witness) had not experienced "directly or through the people to whom [he] delegate[d] surgery or through what [he had] read," and one "which arises once or twice in a lifetime with bad luck," and one with respect to which the answers as to correct procedure are not to be derived from "what textbooks say should be done." He went on to add that he had

---

**9.** In this case, the Court referred to the fact that the expert witness, a physician testifying on causation of plaintiff's injury, used at various times this language:

"[the automobile accident] is consistent with that sort of injury";
"There is probably a cause and effect relationship," and
"My opinion is there is an arthritis which is consistent with traumatic arthritis."

The Court found none of these phrases sufficient to support submission of causation to the jury, and in so doing employed the quoted language. (p. 535)

*Cf., Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 368 (D.C.App.1980), in which the plaintiff in a medical malpractice case objected to the use by the trial judge of the term "a reasonable medical certainty," contending that the correct term in this context was "a reasonable medical probability." The Court found no reason to resolve the issue since under either definition the result would have been the same. The Court did say, however:

"In a medical malpractice case, where legal and factual causation are major issues, there may well be a sound basis for the requirement that expert medical testimony be given in terms of 'reasonable medical certainty.' However, in some situations, such as where factual causation is indirect or the doctrine of res ipsa loquitur applies, that standard might be unduly restrictive."

The case under review is like *Sponaugle* in that, under either term, whether "certainty" or "probability" is used, the result would be the same, as we later point out.

"never seen a case identical to this: [he had] never read of a case identical to it, so there [was] basically no precedent," "no published rules for such a situation." In repeating this thought, he said that "there was no precedent to this case, because all the rules were off and there was nothing to govern management except assessing the risks and values and options and taking the best—the least risks," recognizing that "[a]ll [the options] are very high-risk operations," and "at this point are poor." In short, then, the defendant, in the opinion of Dr. McGuire, was not confronted in his treatment of the plaintiff with a normal surgical operation but with a "unique case" of "notorious difficulty"[10] which a reasonably competent surgeon would not have likely seen or read of before this patient came under his care and in the treatment of which the surgeon would have to improvise his actions as best he could.

The witness first addressed the standard of care followed by the defendant in his treatment of the plaintiff. In so doing he said that his testimony both with respect to standards of care and of causation was based on "a national standard of orthodoxy" though, after some questioning by the district judge, he testified he was familiar "with the standard of care, the learning skill and care possessed and practiced in the hospital, . . . in Winchester [Va.]," which he regarded as "similar to [the hospital in] Staunton." He expressed the opinion that the operation performed by the defendant on the 18th and the use of the Senstaken-Blakemore tube "met the expectations of the good practice of general surgery." He then identified three areas where the defendant's actions did not in his opinion accord with the appropriate standard of care. The first related to the defendant's authorization of "liquids" administered by mouth to the plaintiff on August 21, four days after "esophageal surgery." The witness testified such action departed from the rule to be followed in connection with mouth feeding after esophageal surgery, which was:

"The rule says, or advice as published theories—I can't—The *most conservative practice* is the one that we employ at the Medical College of Virginia of not allowing the patient to have anything by mouth for the first ten days following the operation, and then feeding of contrast material, radio-paque material in the X-ray Department, to demonstrate the integrity of the esophageal wound before feeding the patient. *That's probably the ultimate in conservatism.* (Italics added)."

The witness added that there was a middle ground suggested in the American College of Surgeons' Handbook on Post-Operative Care, which apparently suggested that mouth feeding might be permitted on the "sixth day" after such operation. When pressed, however, by the district judge to respond more positively, the witness first said, "I don't want to be arbitrary about it (*i.e.*, when to authorize mouth feeding) because the variety of—There's a range—." Expressing further dissatisfaction with the witness' response, the district judge pointedly inquired of the witness: ". . . what would be generally considered to be good practice in Staunton or a similar community in 1972 [in this regard]?" To this positive question, the witness responded: "I would say *the best practice* in Staunton would be what we do at the Medical College," a practice which he had earlier identified as "the ultimate in conservatism. (Italics added)."

It is, to say the least, doubtful that such testimony was sufficient to make a jury issue of whether the authorization of mouth feeding of "liquids" on August 21 was a violation of the standard of care as fixed by Virginia law. At no point did the witness testify to either the "customary" or "normal" procedure followed by a practitioner of surgery in a hospital such as that in Staunton or a similar community. His test, by which he would find negligence, involved what he himself declared to be the "most

10. This was Dr. Wellon's description of the medical problem presented by plaintiff's condi- tions.

conservative" procedure, as followed at his hospital, not the procedure ordinarily followed in hospitals similar to the Staunton hospital. *Cf., Rogers v. Okin, supra,* 478 F.Supp. at 1385. The plaintiff, however, seems to have passed over this point and to have concentrated on his causation position. We shall, therefore, assume without actually deciding that the witness' testimony was sufficient to have made a jury issue of whether the mouth feeding on the 21st was a departure from the acceptable standard of care followed "by the ordinary, prudent practitioner in [the defendant's] field and community, or in similar communities, at the time."

The witness raised an objection, also, to feeding later on the 28th through a gastrostomy tube, suggesting that this was another departure from the standard of care required. However, the witness was unwilling to testify that such a procedure would be likely to be understood as improper by a surgeon practicing in Staunton. When asked by plaintiff's counsel, "[w]ould a surgeon in 1972, an average surgeon exercising the standard of care that we have used earlier, be expected to know that gastrostomy tube feedings might wind up in the chest cavity through an esophago-pleural fistula?" The witness answered:

"That's really difficult for me to answer, because the circumstance arises—again, answering in terms of Staunton—the circumstance arises once or twice in a lifetime at most with bad luck. I'd add that it's published that it does; it is taught that it does, but to read those publications and to relearn it is very infrequent."

After this answer, plaintiff's counsel inquired of the witness if he had made "a review of the literature available generally to physicians and surgeons in community care hospitals in 1972 regarding management of the esophago-pleural fistula," and the witness replied, "[n]ot a thorough review." At this point, the plaintiff's counsel

abandoned any further interrogation of the witness on gastrostomy tube feeding, apparently assuming that the witness was not in a position to testify that, under the circumstances of this case, gastrostomy tube feeding would have been recognized as a departure from the standard of care to be charged against a surgeon practicing at Staunton.

There was, also, some discussion by the witness of what he described as "inadequate drainage." It was the witness' opinion that "drainage from the pleural space is difficult" and, to be effective, "the drain has to be fairly close to the fistula." He gave the opinion that the drainage was, "ineffective" in this case but he was indefinite on the basis for such opinion. It seems that, "in retrospect and review," he reached his opinion because of the "passification" of plaintiff's chest. But without indulging in retrospection, the witness conceded that "the adequacy of drainage" could have been determined accurately by the X-rays in the case. The witness, however, had not examined the X-rays nor had plaintiff's counsel asked him to review the X-rays. In addition, at no time in his testimony in connection with drainage was the witness interrogated on the proper standard of care to be expected of a surgeon in Staunton in connection with the "difficult" problem of drainage in this case. The nearest plaintiff's counsel came to this was in response to this question:

"What could have been done by a surgeon exercising ordinary and reasonable skill, care and diligence to prevent the drainage at the point where it was discovered that not only food was coming out through the fistula and thence through the drainage tube, but also that there was some bloody material coming through the drainage tube?" [11]

The witness never answered the direct question addressed to him but responded that "the patient should [have been] reoperated on, the chest opened and the esophagus

---

11. The question seemingly refers to plaintiff's condition when Dr. Todd examined him on the morning of August 22.

sutured and the tube replaced close to the closure but not on it." This answer obviously was not related to the adequacy of the drainage *per se*. Nor for that matter was the question couched in the proper form to elicit an answer conforming to the Virginia standard of care in effect at the time this action originated or was tried.

The final claim of a factual violation of the surgeon's duty of care in this case relates to the defendant's failure to reoperate on August 22 when renewed bleeding was discovered in the drainage.[12] Dr. McGuire testified that it was "generally advocated" that a reoperation in such a case should be tried. Defendant's counsel, however, inquired what was the likelihood of success in such a reoperation. The witness was restrained in his reply; he contented himself with declaring merely that there was "a possibility" of success. His actual answer was:

> "Well, there's a possibility that it can be closed and it is generally advocated that an attempt be made to close it, excepting the fact that a certain proportion, probably roughly half, will releak with a smaller leak than they had the first time.
> "Q. So there's a high possibility of it releaking. There's also a high possibility that the tissue is just not sensitive to hold sutures?
> "A. That's correct."

This answer plainly was not sufficient to establish that a surgeon of ordinary skill and prudence, practicing in Staunton, would have followed any such practice, which the witness says is "generally advocated" in cases already characterized by the witness as "unique" and without "precedent." For that matter there was no evidence that any surgeon in the Staunton area had ever encountered a medical problem such as that presented by plaintiff. Actually, the witness himself never testified that he had confronted such a problem. It is difficult to see how this evidence established a standard of care applicable to this case under *Reed v. Church, supra*, 8 S.E.2d 288.

Such was the evidence of negligence by which the plaintiff sought to satisfy his burden of showing that, in this unusual and unique medical situation, in which the surgeon, in his actions was without any precedent as a guide and was forced to improvise as best he could among a number of treatment options all of which involved high risks and none of which assured success, the defendant had not met the standard of care as mandated under Virginia law. However, as we have said, the real focus on the argument in this court as it was in the district court was not on the issue of negligence but on the presence or absence of sufficient evidence of causation, as defined by Virginia law, to require submission of the cause to the jury, and we proceed to that issue, assuming without deciding, that there was sufficient evidence of negligence on the part of the defendant.

As we have said, the plaintiff sought to establish causation through the testimony of Dr. McGuire. Only if that testimony provides evidence sufficient to make the issue of causation one for jury submission can the plaintiff complain of the district court's ruling. In an effort to meet that requirement, the plaintiff addressed a number of hypothetical questions to the witness, which, together, covered all of plaintiff's claims of negligence on the part of the defendant pressed by the plaintiff at trial. These answers to the hypothetical questions constitute the entire substantive

12. Parenthetically, it should be noted that the defendant was not present when this condition developed. At that time, he had turned the case over for the time being to Dr. Todd. The defendant does not appear to rely on this fact, and we merely note it without ascribing any particular relevance to it in view of the defendant's failure to press the point.

During his cross-examination of Dr. Wellons on this aspect of the case, counsel for the defendant inquired whether, in his deposition taken prior to trial, the witness had testified that "once a fistula had developed" in the esophagus, "it would be foolhardy to attempt to close it surgically." Before the witness could answer, the District Judge interrupted to suggest that such evidence was immaterial. Counsel for the defendant did not pursue the subject with the witness nor did he offer the deposition in evidence. There, however, did not appear to be any dispute over the testimony as it appeared in the deposition.

evidence of causation and, unless they measure up to the required standard, there was not sufficient evidence of causation and the direction of verdict for the defendant on that ground was proper.

With reference to negligence in permitting mouth feeding on August 21, as a basis for a finding of causation, the plaintiff directed this question to the witness:

"Based upon your expertise, as well as your knowledge of this case, can you state that it is more likely than not that the food coming through the fistula, with accompanying bacteria contamination, caused the plaintiff's lung infection?"

The witness' initial answer was:

"No, because there is the, you know—The fistula alone without food is the cause of infection or cause of empyema, which can go into bronchopleural fistulas. It could have happened without the—if he hadn't been fed. I think the likelihood was greater as a result of feeding, but by increasing the likelihood, I can't say that was the cause. The food can't be the cause, because it just increased the likelihood."

He went on to amplify this answer:

"I think the lung infection is caused by the fistula and that saliva that's gathered here is whatever happens to be in the esophagus. The fistula is caused by the physical properties of the esophagus and the balloon combined. The feeding may have caused it to be manifested a little sooner, may have spread it a little wider, but the contribution of feeding was not the major contribution. The whole outcome may have developed as it did with no feeding. So I can't say that the feeding was—The feeding probably made it manifest earlier, may have made the space larger, disseminated the infection in the lung, pleural cavity, maybe a little bit farther, or could have occurred with saliva gastric juices, and so forth."

The witness was, also, examined by the District Judge with reference to the alleged error in failing to reoperate or to change the drainage oftener as a basis for a finding of causation. The question addressed to the witness on this aspect of the case was:

"Suppose he [i.e., the defendant] had operated again and suppose that he had changed the drain back, can you state with a reasonable degree of medical certainty that this infection would not have occurred in the lung anyway?"

To that question, Dr. McGuire answered:

"I cannot say it with certainty that it would not have occurred."

When the District Judge requested the witness to elaborate on this answer, Dr. McGuire testified:

"Well, I can put it in terms of positives instead of some negatives. I could say that the infection might have occurred in the lung; he might have had an emphyema, a bronchopleural cutaneous fistula even had he been managed ideally according to the best surgical dictums of re-operation and replacement of drains; he still might have developed the pleural space infection and the infection of the lung subsequent, sir."

Finally, the plaintiff's counsel turned to the improper drainage claims and asked the witness this question:

"If optimum drainage had been put in at the time of the operation, that is, as close as possible to the location of a potential fistula, [could he] state with a reasonable degree of medical certainty that the infection could have been managed by antibiotic regimen and nothing by mouth until a fistula, if any were going to develop, had healed spontaneously?"

His answer was:

"No, not with a reasonable degree of certainty."

He went on to add, "[i]t might have been." This answer apparently did not satisfy counsel and, after repeating the witness' answer, he rephrased the question:

"Are you stating with a reasonable degree of medical certainty, the lung infection would—if developed, would have been manageable and is not threatening alone?"

The witness' answer was:

"No, not with a reasonable degree of certainty that it—I—You know, if you put the [drainage] tube in right at the

time of an operation just perfectly as close as you can but not touching; assuming you're going to get a breakdown, hoping that the breakdown will spill right out of the esophagus, into the mouth of the tube and out to the chest wall, twenty to thirty percent chance it'll work." [13]

It is perfectly clear from this summarization of the pertinent expert testimony of Dr. McGuire that the latter at no time gave an opinion that, based upon reasonable medical certainty, the plaintiff's injury would not have resulted "but for" those actions of the defendant which Dr. McGuire faulted, nor could it be said that he ever testified that "without [the defendant's challenged actions] that [infection of the plaintiff] would not have occurred," or that it was "more likely" that the infection was caused by the defendant's alleged negligence than by other causes for which the defendant was not responsible.[14] Yet, without such evidence, it would have been necessary, in order for the jury to find causation on the basis of the record, to have proceeded upon pure "speculation and guess work" without any supporting testimony establishing causation under the standard fixed by the Virginia law. The District Judge correctly perceived this and directed a verdict in favor of the defendant. We find no error in such ruling and accordingly affirm the judgment in favor of the defendant.

AFFIRMED.

13. The "twenty to thirty per cent chance," of no infection occurring in any event means that the chances of infection in the plaintiff's case under ideal conditions, including no feeding by mouth or gastrostomy tube, are seventy to eighty per cent.

14. The chances that the infection would have occurred without any negligent conduct on the part of the defendant were given by Dr. McGuire as 70 to 80 per cent; the likelihood that the defendant's negligence could have caused it did not rise beyond 15 to 25 per cent in the witness' opinion. That does not meet the test for causation. How, under those assumptions, could it be said that the infection was "more likely" or "more probably" due to some action of the defendant than any other except by pure speculation and conjecture? Neither under the state nor federal rule does such proof suffice to make causation a jury issue. That was early declared by Judge Taft in *Ewing, supra*, 78 F. at 444, in language quoted and approved by the Virginia court in the leading case of *Hunter v. Burroughs, supra*, 96 S.E. at 369, where Judge Taft was determining the sufficiency of the evidence under the scintilla rule.